STATE of Minnesota, Respondent,

v.

Gerald W. NORRIS, Appellant.

No. C9–87–1414.

Supreme Court of Minnesota.

Aug. 5, 1988.

---

D. Richard Hellweg, Asst. Public Defender, C. Paul Jones, State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, State Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Co. Atty., Vernon E. Bergstrom, Chief, Appellate Section, Anne E. Peek, Linda K. Jenny, Minneapolis, for respondent.

WAHL, Justice.

Gerald W. Norris was convicted by a Hennepin County District Court jury of murder in the first degree and five counts of assault in the second degree, in connection with the armed robbery of the Schooner Bar in Minneapolis, and the shooting death of James Nelson, a patron of the bar, on October 16, 1986. He was sentenced to life imprisonment for the murder conviction and to consecutive terms of 60 months for each of the five assault convictions. In this appeal, Norris argues, through his attorney, (1) that the evidence is insufficient to sustain his convictions, (2) that the trial court erred in admitting *Spreigl* evidence of a prior aggravated robbery by defendant, and (3) that a sentence of life imprisonment plus five consecutive 60–month terms unduly exaggerates the criminality of his conduct. He also argues, in his pro se brief, (1) that he is entitled to a new trial because of newly discovered evidence; (2) that the trial court erred in allowing his 1985 conviction for theft by swindle to be used for impeachment purposes; (3) that the elicitation of evidence concerning the police department's prior knowledge of Norris' activities constituted prosecutorial misconduct and warranted a mistrial. We affirm the convictions.

Norris' convictions arise out of the October 16, 1986 robbery and shooting at the Schooner Bar, 2901 27th Avenue South, in south Minneapolis. In the early evening on that date about 20 to 30 people were gathered at the bar, most of them to celebrate the 39th birthday of James Nelson. At approximately 7:45 p.m., two men wearing ski masks and carrying guns entered the side door of the bar. Everyone in the bar was ordered to the floor, except the bartender who was on the phone when the gunmen entered. One of the men ordered her to put the cash register and cash drawer contents into a bag which he handed her. That gunman also pointed his gun directly at the chest of Craig Larson, who was standing alone, and then fired past Larson at the wall. At that point, John Williams, the party on the other end of the phone, realized that a robbery was in progress, and dialed 911.

In the meantime, the second gunman proceeded toward the front of the bar. He encountered James Nelson, who placed his hands on the gunman's shoulders and began to move him quickly toward the front door. As Nelson pushed the gunman into the front entryway, the gunman lifted the gun toward Nelson's chest, and from inches away, shot him. At the time, Nelson's hands were at his sides; the two had not been struggling for the gun. Nelson fell and was verbally threatened. The gunman then put his gun in Richard Heider's chest, pointed his gun from two feet away at Thomas Nelson's face, from about five feet away, pointed his gun directly at Lowell Stinar's chest or stomach and ordered each to the floor. The two gunmen fled through the back door of the bar with approximately $1192. The entire incident took four to seven minutes. James Nelson died in surgery about two hours later.

Two witnesses observed an older yellow Chevrolet with a rusted fender speeding away from the Schooner Bar area at the time of the robbery. One witness saw the driver's door open as it turned a corner.

The second witness saw two passengers and also noticed that the car made a noise as the brakes were applied.[1] Both witnesses were able to identify the car upon seeing it later.

Officer Ronald Johnson, the first police officer on the scene, talked with witnesses and immediately dispatched a general description of the gunmen. He testified that he radioed height, weight and race, and stated " * * * from one individual I got a description of a southern accent, possibly a light-skinned black, so I put that out too, but most of the descriptions I got were of two white males * * *." A general description of the car was also dispatched. Sergeant Laurence Will, a robbery officer, recognized the description as similar to a car owned by defendant and relayed information regarding Norris' address and license plate number to his fellow officers. Police then went to Norris' address, 956 Fourth Avenue North, and found the suspect car at 8:06 p.m. The car's hood was still warm. Almost immediately, Billings saw a female, carrying a blue knapsack, coming out the front door of Norris' house. When she was ordered to stop, she began to run, looking back at the house, yelling, "Run, Jerry, the police have got me." The woman was later identified as Dawn Kingsbury, Norris' girlfriend. She was apprehended and forcibly placed in the squad car. Inside the knapsack, police observed a ski mask and revolver. After other officers arrived at the scene, the people remaining inside the house were ordered to come out with their hands up. Jerry Dewayne Clark and Gerald W. Norris came out and were arrested.

A number of items were subsequently seized from the blue bag, including a brown ski mask, surgical gloves, a corduroy sport coat, two revolvers (later identified as .38 and .25 caliber pistols), ammunition, expended cartridges and other miscellaneous clothing items. The ski masks,

---

1. On October 17, 1986, after Norris and Clark were arrested and Norris' car identified, Sargeants Skala and Johnson of the Homicide Division test drove the vehicle. They learned that

the engine belts made a squealing noise when the car was revved up to a high RPM and, when turning a corner, the driver's door flew open.

revolvers and most of the clothing items were later identified at trial.

Later, the police executed a search at 956 Fourth Avenue North and found 88 one-dollar bills laid flat in a woman's purse and $511 rolled up and stuck in the pocket of a maroon insulated vest in an upstairs bedroom. They also found $585 stuffed in a six-pack of toilet paper underneath the bathroom sink.

Initially, Clark denied involvement in the crime, but after learning that Nelson had died, he gave a full statement to the police admitting his guilt and implicating Norris as the other gunman. Both were indicted on November 4, 1986 on charges of felony murder in the first degree in violation of Minn.Stat. §§ 609.185(3), 609.11 and 609.05 (1986) and five counts of second degree assault in violation of Minn.Stat. §§ 609.-222, 609.11 and 609.05. A jury found Clark guilty on all counts before Norris' trial began. Clark agreed to testify against Norris after negotiating an agreement with the state whereby he would serve a life sentence in a facility outside of Minnesota and would not be sentenced on the assault convictions.

Clark's testimony, at trial, regarding events surrounding the robbery and shooting death on October 16, 1986, was as follows: Norris had suggested robbing the Schooner Bar about a week earlier. They visited the bar in the afternoon about four days before the robbery to "see how many people would be in there * * * what kind of bar it was, and just kind of check it out." They knew that more people would patronize the bar in the evening. Clark testified that they then planned the crime together; he was to act as "backup man."

Clark had been staying with Kingsbury and Norris for about two to three days prior to the robbery. On the day of the robbery, he, Norris and Kingsbury went to a gunstore on Lake Street where Kingsbury bought bullets for a .25 caliber gun. When she came out of the gunstore, Norris made sure she had the right bullets and joked about some problem they had earlier getting the wrong bullets for weapons. Clark claimed that they used a small .25

caliber automatic and a black, short-barreled .38 snubnose in the robbery. The clothes worn in the robbery were furnished by Norris who obtained the masks and rubber gloves from a mutual friend either the day before or the morning of the crime.

That evening they drove to the Schooner Bar in Norris' car and parked it about one block away. They put on the gloves in the car but did not don the masks before reaching the side entrance of the bar. Clark stated that he carried the .25 automatic. Both guns were loaded and safeties removed by Norris prior to entering the bar. Clark also testified that he "was too keyed up and nervous to remember" which mask he wore, that they both had tried on each mask, that Norris was wearing the corduroy jacket, and that Clark wore a blue pullover hooded sweatshirt. He also testified that Norris disguised his voice with a southern accent. Clark claimed that after leaving the bar, he stuffed both the gloves and masks into the bag with the money but dropped one of the masks as they ran out. As they sped away, the driver's door on Norris' car swung open twice. When the two reached Norris' house, they removed all clothing in the living room and stuffed it into a blue bag which Kingsbury had brought from a closet. After removing the money from the paper bag, Clark then flushed the bag down the toilet. Clark hid his half of the money under an upstairs bathroom sink. He testified that Norris hid his half in "a couple different places" in their upstairs bedroom.

Norris testified in his own behalf and denied involvement in the Schooner Bar robbery and murder. He admitted that he had known Clark since 1977 and had allowed Clark to stay with him and Kingsbury for a few days prior to October 16, 1986. Norris claimed, however, that he literally kicked Clark out of the house in the early morning hours on the 16th when he discovered Clark and another man in a homosexual embrace on the front room couch. Norris said the other man was "either . mullato or Native American and black" and was named Tommy. Apparently, Clark returned sometime during the

night. The next day, according to Norris, he took Clark along with him and Kingsbury on some errands, had lunch with Clark, and then drove him to his old residence to pick up some things. Norris also testified that he loaned Clark both a blue backpack and his car around 7:00 that evening. While Clark was gone, Norris stated that he picked up broken bottles and cans from around the house and then walked to Plymouth and Emerson (about one mile away) for a six-pack of beer. He said Clark returned at 7:55, very upset and frantic, stating that he and Tommy had committed a robbery and shot somebody. Norris then directed Kingsbury to remove the blue backpack from the house. Shortly thereafter, Norris and Clark were arrested.

Valentino Hazley, who was in custody pending trial for robbery at the time of Norris' trial, testified in Norris' defense. He claimed that in October or November of 1986, while he and Clark shared a jail cell in the holding area, Clark told Hazley that he and a black man called Tommy, Tom or Tim robbed the Schooner Bar. He did not tell the defense investigator about the conversation until April 22, 1987. Hazley also admitted that he and Norris spent time together in jail on the same floor. Clark denied knowing Hazley or telling anyone that he had committed the robbery with a black man.

■ 1. The first issue is whether the evidence is sufficient to sustain defendant's conviction for murder in the first degree and five convictions for assault in the second degree. In a criminal case this court makes a painstaking review of the record to determine if the evidence was sufficient to permit the jury to reach the conclusion that it did. *State v. Ellingson*, 283 Minn. 208, 211, 167 N.W.2d 55, 57 (1969). We will not disturb the verdict if the jury, while acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that the

defendant was proven guilty of the offense charged. *State v. McCullum*, 289 N.W.2d 89, 91 (Minn.1979).

■ In Minnesota, an accused may not be convicted of a crime on the uncorroborated testimony of an accomplice.[2] In reviewing the sufficiency of the corroborating evidence of an accomplice's testimony, a reviewing court will view the evidence in the light most favorable to the state and will resolve all conflicts in the evidence in favor of the verdict. *State v. Adams*, 295 N.W.2d 527, 533 (Minn.1980).

We explained the corroboration requirement in *Adams* as follows:

> Corroborating evidence must link or connect the defendant to the crime. It is not necessary that it establish a prima facie case of the defendant's guilt. *State v. Cooper*, 296 Minn. 48, 206 N.W.2d 356 (1973). It must point to the defendant's guilt in some substantial degree. The quantum of corroborative evidence needed necessarily depends on the circumstances of each case. *State v. Mathiasen*, 267 Minn. 393, 127 N.W.2d 534 (1964). Corroborating evidence may be circumstantial or direct. *State v. Stave*, 280 Minn. 269, 158 N.W.2d 848 (1968). If the accused testified, the inadequacies and admissions in his testimony may be corroborative of the accomplice's testimony. Corroborating evidence may be secured from the defendant's association with those involved in the crime in such a way as to suggest joint participation, as well as from the defendant's opportunity and motive to commit the crime and his proximity to the place where the crime was committed. *State v. Mathiasen*, 267 Minn. 393, 127 N.W.2d 534 (1964).

*Id.*

■ Finally, the corroborative evidence of an accomplice's testimony is sufficient if it is weighty enough to restore confidence in the accomplice's testimony, confirming its truth and pointing to the defendant's

2. Minn.Stat. § 634.04 (1986) provides:
A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the

defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

guilt in some substantial way. *State v. Houle*, 257 N.W.2d 320, 324 (Minn.1977).

■ In the present case Norris claims that the evidence presented at the trial was insufficient to prove either his identity as perpetrator of the crime or, in the alternative, his intent to kill James Nelson.[3] He argues that his conviction is based upon accomplice testimony because no witness, other than Clark, identified him as the person who robbed the Schooner Bar. Further, Ronald Johnson, the first police officer on the scene, initially described a light-skinned black with a southern accent as the perpetrator. Norris also argues that the scientific evidence was inconclusive: there were no usable fingerprints; the presence of blood on any of the gunmen's clothing was not confirmed; the hair samples could have been cross-contaminated by other pieces of clothing in the backpack. He relies on one witness' testimony that the gunman shot the victim with his left hand to assert that, as a right-handed individual, Norris could not exert the ten pounds of force necessary to activate the trigger on a .38 automatic pistol.

Clark, the state's key witness, was an accomplice. By giving a detailed and consistent account of the crime, however, he reinforced his own reliability as a witness. Further, the testimony of eye witnesses and experts at trial corroborated numerous details of his testimony not only concerning the facts of the crime itself but also Norris' involvement in the crime.

Contrary to assertions made by Norris in his pro se brief, Clark did not have access to either police reports or other witnesses' statements before making his own statement to the police the evening of the crime. Yet, he was able to describe and later identify the clothing and guns used by the gunmen in the crime. He knew that one of the gunmen disguised his voice with a southern accent. He also identified Norris' car and problems with the car door. Clark further reinforced his reliability by telling the police where he had dropped one of the masks during the getaway and where the stolen money was hidden.

Clark's testimony was corroborated by the following evidence:

a) Norris admitted that Clark was living with him and Kingsbury on the day of the crime and that he had spent the day of the crime with Clark.

b) Norris and Clark were arrested together in Norris' home within 20 minutes of the time that the crime began. John Williams' call to 911 was logged at 7:46. Dawn Kingsbury was seen leaving Norris' home at 8:06, and Clark and Norris were arrested shortly after.

c) Norris fit the general description of the second robber given to police by a number of witnesses: between 5' 10" and 6 feet, 170 to 180 pounds, white male. Only Tom Nelson described one of the robbers as a "white male or extremely light-skinned Negro," but he based his description on both the limited skin he could see behind the mask and the voice. Richard Heider, the witness who was closest to the gunman who shot Nelson, described that gunman as white, but having a "very commanding southern or black male voice."

d) The fact that Norris' car was used in the crime was corroborated by the police, two witnesses who saw the car leave the Schooner Bar area, and Norris himself.

e) Dawn Kingsbury, Norris' girlfriend, was caught leaving her home carrying a blue bag, which Norris admitted belonged to her, containing guns and clothing used in the robbery. When stopped, she yelled, "Run, Jerry, the police have got me." It is likely that the jury found it difficult to believe that Kingsbury, who Norris testified was upset with Clark for his homosexual activities, would take such a high risk to protect Clark alone.

f) About one-half of the amount of money stolen from the Schooner Bar was recov-

---

**3.** Minn.Stat. § 609.185(3) requires an actor to cause the death of a human being, with an intent to cause that death, while committing a robbery. Minn.Stat. § 609.02, subd. 9(4) provides:

"With intent to" or "with intent that" means that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result.

ered in the bedroom shared by Norris and Kingsbury.

g) Ivan Lundstrom, a salesman at the Minneapolis Outlet Gun Exchange on Lake Street, testified that he sold .25 caliber bullets to Dawn Kingsbury on October 16, 1986. He also sold her Remington .38 specials on September 22, 1986. About one-half hour after the September sale, Kingsbury came back into the store and said "these are the wrong ones" so he gave her a refund. She returned an hour later to buy the same ammunition. These bullets were exactly the same type that were used in the crime.

h) MaryAnn Strauss, forensic hair analyst with the Bureau of Criminal Apprehension, testified that she found one hair on the tan ski mask that microscopically matched Clark's hair and one hair that microscopically matched Norris' hair. It is true, as Norris asserts, that she discontinued her investigation when she suspected that the caps had been cross-contaminated by other pieces of clothing in the blue bag, but it is likely that the jury believed Clark's testimony that they had both tried on each mask. Further, Strauss testified that a coincidental match had not occurred in over 1,000 individuals that she has tested in her work. She also stated that all hairs she found were caucasian and that Negroid hairs tend to fall out more easily than caucasian hairs. She asserted that the friction of putting on a ski mask would definitely affect the falling out of hair of someone of the Negroid race more than a caucasian.

Norris cites evidence which he maintains is inconsistent with his guilt. However, this evidence is either not clearly substantiated or open to alternative interpretation. For example, although it is true that no blood spatters were found on the clothing examined by the microserologist, she also testified that blood spatter tends to go in the same direction as the bullet, with most of the forward spatter apparent at the bul-

let's exit. Norris also asserts that it is unlikely that a right-handed person could apply the ten pounds of pressure necessary to trigger a .38 double action automatic gun using his opposite hand. At best, this argument is speculative. The firearms expert did not testify that a right-handed person could not apply that pressure. Moreover, it was not definitely established that Nelson was killed by a left-handed person. Only one witness, among the many who saw the shooting, testified that the gunman was left-handed.[4]

We have sustained a murder conviction where the evidence corroborating the accomplice's testimony showed that the defendant was with his accomplices at the time of the murder, had access to his fiance's gun, and was similar in general appearance to the man witnesses placed near the crime scene. *State v. Williams*, 418 N.W.2d 163, 167 (Minn.1988), *citing to State v. Adams*, 295 N.W.2d at 533–34. In the present case, Clark's testimony is corroborated. Norris was with Clark throughout the day of the robbery and murder, he either owned or had access to a .38 caliber gun which Kingsbury might have owned, and he met the general description of the gunman that the witnesses in the Schooner Bar testified had shot James Nelson. In addition, his girlfriend bought the bullets. His car was used in the robbery. A hair which matched his was found in one of the ski masks. He was arrested in his home within 20 minutes of the time the crime began and about half of the stolen money was found in his bedroom. The evidence is sufficient to prove beyond a reasonable doubt that Norris was a perpetrator of the murder and five assaults.

Norris argues that even if he was a perpetrator of the offenses, the evidence is insufficient to prove that he intended to cause the death of Nelson as required for felony murder. This argument is without merit. We have stated the rule that an

---

4. Even if Clark was responsible for the shooting, Norris would still be guilty of first-degree murder pursuant to Minn.Stat. § 609.05, subd. 2 (1986), which would impose liability on Norris "for any other crime committed in pursuance of

the intended crime if reasonably forseeable by the person as a probable consequence of committing or attempting to commit the crime intended." *See also State v. Redding*, 422 N.W.2d 260, 264 (Minn.1988).

inference of intent is "not only permissible, but virtually inescapable" when someone prepares himself for a robbery by obtaining a loaded gun. *State v. Campbell*, 281 Minn. 1, 13, 161 N.W.2d 47, 55 (1968). Intent may also be inferred from the manner of shooting the victim. *Id.* In this case, two robbers entered the Schooner Bar with loaded guns; the safeties were off. They entered the bar in the early evening hours when they anticipated that a larger number of customers would be present. There is no evidence in the record that the gunman and his victim struggled over the gun. Moreover, there was ample evidence that the victim had his hands on the gunman's shoulders rather than on the gun. Nelson's arms were actually at his side when he was shot. Finally, an expert testified that the gun which shot Nelson did not have a "hair trigger;" in fact, it required ten pounds of pressure to release the trigger. From this evidence it is unlikely that the jury could find either a spontaneous or an accidental shooting. We hold the evidence is sufficient to sustain defendant's convictions of murder in the first degree and six counts of assault in the second degree.

2. We next consider whether the trial court erred in admitting *Spreigl* evidence of a prior aggravated robbery committed by defendant.

■ The general rule is that evidence of unrelated prior crimes may not be introduced against an accused to prove the present charge unless it comes under one of several recognized exceptions. *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965). The codification of this general rule and its exceptions can be found in Rule 404(b) of the Minnesota Rules of Evidence which provides:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts, is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identify, or absence of mistake or accident.

In *State v. Forsman*, we have described the "common scheme or plan" exception as embracing "evidence of offenses which, because of their marked similarity in modus operandi to the charged offense, tend to corroborate evidence of the latter." *State v. Forsman*, 260 N.W.2d 160, 167 (Minn. 1977).

The key factors in determining whether *Spreigl* evidence is admissible are:

[W]hether the evidence is clear and convincing that defendant participated in the *Spreigl* offense, whether the *Spreigl* evidence is relevant and material to the state's case, and whether the potential of the *Spreigl* evidence for unfair prejudice substantially outweighs its probative value.

*State v. Morrison*, 310 N.W.2d 135, 137 (Minn.1981), *citing to State v. Bolts*, 288 N.W.2d 718 (Minn.1980). In determining relevancy, this court has generally required that the prior crime be similar in some way—either in time, place, or modus operandi—to the charged crime. However, this is not an absolute necessity. *State v. Filippi*, 335 N.W.2d 739, 743 (Minn.1983). Whether or not to admit evidence of other crimes rests in the sound discretion of the trial court and will be upheld unless a clear abuse of discretion is shown. *State v. Ture*, 353 N.W.2d 502, 515 (Minn.1984).

■ In the present case the trial court admitted *Spreigl* evidence of an aggravated robbery committed by Norris in 1978 for the purpose of establishing identity and modus operandi. The prior crime was described as follows: On May 24, 1978, Norris and an accomplice robbed a south Minneapolis pharmacy at around 7:15 in the evening. Norris, disguised as a woman and wearing tape and cotton on his nose, carried a loaded revolver. He ordered everyone to lie down on the floor and then demanded drugs and money. At one point, Norris put his gun to the head of one of the workers and threatened to blow his head off if he did not stay down. He also hit the pharmacist with the gun. Norris then shed his disguise while making his getaway. The car used in the getaway belonged to Norris' girlfriend at that time, and money

taken in the robbery was found in her home where he was staying. Norris pled guilty to aggravated assault and was incarcerated from November 1978 until April 1984.

Norris argues that any connection between the *Spreigl* and the charged offenses was made tenuous by the eight-year gap between the two crimes. Further, he contends that the state failed to show a sufficient similarity between the 1978 and 1986 robberies. We disagree.

The *Spreigl* evidence meets the "clear and convincing" standard because Norris was convicted of the *Spreigl* offense and admitted details of that robbery. The state established its relevance to the current charge in that both robberies were committed by two gunmen, in the early evening hours, at public businesses in south Minneapolis. In both events the gunmen wore disguises which they shed as they left·the crime site, carried loaded revolvers, and made similar threats to the victims. Although the *Spreigl* offense occurred eight years before the current charge, Norris was incarcerated for almost six of those eight years. As we stated in *State v. Crocker*, 409 N.W.2d 840 (Minn.1987):

> Numerous cases of this court hold that if a defendant was imprisoned in the interval between the prior offense and the current offense and was incapacitated from committing crimes, then the mere passage of time is not necessarily of any significance. *See State v. Filippi*, 335 N.W.2d 739, 743–44 (Minn.1983), and cases cited therein.

409 N.W.2d at 843.

Finally, the record does not show prejudicial behavior on the part of the court or the prosecutor in presenting *Spreigl* evidence. The instruction read to the jury prior to the presentation of the *Spreigl* evidence was negotiated and agreed to by both parties.

We hold that the trial court properly admitted the *Spreigl* evidence of a prior aggravated robbery by the defendant.

3. The most troublesome issue raised by the appeal is whether a sentence of life imprisonment plus five consecutive terms of 60 months each unduly exaggerates the criminality of appellant's conduct.

 Minn.Stat. § 609.035 (1986) bars multiple sentencing in cases of multiple offenses committed as part of the same behavioral incident. *State v. Montalvo*, 324 N.W.2d 650, 652 (Minn.1982). However, in cases involving multiple victims, a trial court may impose one sentence per victim so long as the multiple sentences do not unfairly exaggerate the criminality of the defendant's conduct. *State v. Marquardt*, 294 N.W.2d 849, 851 (Minn.1980). Where sentences are all within the presumptive sentence range, this court will generally not review the trial court's exercise of its discretion. *State v. Williams*, 337 N.W.2d 387, 391 (Minn.1983).

In the present case Norris was convicted of six separate crimes: murder in the first degree of James Nelson and five counts of assault in the second degree of five separate victims. He and his accomplice purposely entered a crowded bar in the evening hours carrying loaded firearms with the safeties off. They shot one warning shot into the wall, separately threatened five individual patrons by pointing a gun at each at close range, and Norris shot and killed a sixth patron who was attempting to push him out the door. He was sentenced to a term of life imprisonment plus a consecutive term of 300 months. Norris' sentence was computed using an offense severity level of six and a criminal history score of eight points. Although the presumptive sentence for the assaults pursuant to the sentencing guidelines was actually 65 months, Minn.Stat. § 609.222 (1986) provides that 60 months is the statutory maximum for second degree assault.

 When a criminal defendant raises an issue of fairness in sentencing on appeal, this court has the discretion to modify the sentence. *State v. Vazquez*, 330 N.W.2d 110, 112 (Minn.1983). To achieve fairness, we will compare the defendant's sentence with those of other offenders. *Williams*, 337 N.W.2d at 390. In numerous cases involving aggravated robbery, assault, and multiple victims, we have al-

lowed consecutive sentences to stand. *See e.g., State v. Schneider,* 402 N.W.2d 779, 790 (Minn.1987) (burglary of office building, kidnapping of tenant and first-degree murder of police officer were committed against different persons and justified imposition of consecutive sentences); *Williams,* 337 N.W.2d 387 (sentencing defendant to consecutive 54–month prison terms upon conviction for two counts of aggravated robbery based on robbery of two house residents not barred by multiple sentencing statute); *Montalvo,* 324 N.W.2d 650 (consecutive sentencing of defendant upon conviction of two counts of aggravated assault in the second degree based on assaults of two victims not barred by multiple sentencing statute); *Marquardt,* 294 N.W.2d 849 (consecutive prison terms for second degree manslaughter—five years— and aggravated assault—three years— committed against two separate victims by defendant in firing two bullets into a bar striking seven persons after being ejected from the bar not barred by Minn.Stat. § 609.035). None of these cases have involved more than three multiple sentences, however, and most of them have involved two sentences to be served consecutively.

■ The sentence given Morris is technically permissible, and he concedes that this is so. Our review of the cases leads us to conclude, however, that the consecutive application of five terms of 60 months each for a total of 300 months, added to a sentence of life imprisonment for murder in the first degree, on the facts and circumstances of this case, unfairly exaggerates the criminality of defendant's conduct. We modify the sentence by holding that three of the five sentences for aggravated assault be served concurrently.

■ 4. Norris raises additional issues in his pro se supplemental brief. We hold those issues are without merit.

a) The trial court did not err in allowing Norris' 1985 conviction of theft by swindle

to be used for impeachment purposes pursuant to Minn.R.Evid. 609(a)(2).[5]

We have held that the "essence of a swindle is the defrauding of another of his property by deliberate artifice." *State v. Olkon,* 299 N.W.2d 89, 106 (Minn.1980). The offense covers a broad range of fraudulent conduct and would appear to be precisely admissible for impeachment purposes. *Id.*

■ b) Norris is not entitled to a new trial on the basis that newly discovered evidence—that Gale Rachuy, an inmate at the Minnesota Correctional Facility, told the public defender's investigator in August 1987, that he had also been told by Clark that Norris was not involved in the shooting death of Nelson and the robbery of the bar—would corroborate the testimony of defense witness Valentino Hazley. A new trial may be granted on the basis of newly-discovered evidence but the petitioner must show:

> that the evidence could not have been discovered through the exercise of due diligence before the trial; that at the time of the trial the evidence was not within petitioner's or his counsel's knowledge; that the evidence is not impeaching, cumulative, or doubtful; and that it would probably produce a result different from or more favorable than that which actually occurred.

*State v. Caldwell,* 322 N.W.2d 574, 588 (Minn.1982).

Both Hazley and Rachuy are testifying to basically the same thing: a conversation with Clark absolving Norris and implicating an unknown black accomplice. Both witnesses are impeachable sources. *See, e.g., State v. Garasha,* 358 N.W.2d 657, 660 (Minn.1984). Although Norris asserts that Rachuy's testimony would undoubtedly make a difference in the verdict, he has not shown why a new jury would be any more likely to believe Rachuy rather than Hazley.

5. Minn.R.Evid. 609 provides:
 (a) General Rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established

by public record during cross examination but only if the crime * * * (2) involved dishonesty or false statement, regardless of the punishment.

 c) Finally, there is no evidence of prosecutorial misconduct nor improper denial of a motion for a mistrial which requires reversal and a new trial. Norris claims that the prosecutor violated a pretrial order which prohibited the admission of evidence related to police surveillance of Norris prior to October 16, 1986, and that the trial court erred in denying a mistrial when some of the evidence was unintentionally revealed.

At the Rasmussen hearing, defense counsel moved to suppress any statements to the effect that Sergeant Will knew Norris' license number because he was a suspect in other robberies. The court directed counsel to negotiate a settlement on this issue, and both the defense and the state agreed that the state would not elicit any testimony along those lines. Later in the trial, during Clark's direct examination, Clark referred to "Norris' MO." Norris claims that this reference, as well as Sergeant Will's later testimony that he gave the investigating officer Norris' name, address and license number violated the pretrial agreement.

In denying defense counsel's motion for mistrial, the trial court found that the prosecutor "did everything he could including a verbal and hand signal, if you will, to Clark to stop talking immediately, and I believe that Clark did, in fact, stop talking immediately * * *."

There is no evidence here that the state intentionally elicited or anticipated Clark's statement. Furthermore, defense counsel did not object at the time because he did not want to emphasize the matter and raise a "red flag." The present case parallels *State v. Haglund*, where we held that where a prosecutorial elicitation is unintentional, we will reverse only if the evidence is prejudicial. 267 N.W.2d 503, 506 (Minn. 1978). Here, the other evidence against Norris, including the *Spreigl* offense admitted in part to establish a modus operandi, effectively dilutes any prejudicial effect that Clark's comment might have had.

We affirm the judgment of convictions and the sentence as modified.

Convictions affirmed; sentence of life imprisonment with three of the five consecutive sentences of terms of 60 months each to be served concurrently.