STATE of Minnesota, Respondent,

v.

James Robinson POOLE,
Petitioner, Appellant.

No. C3–91–1963.

Supreme Court of Minnesota.

April 23, 1993.

Marc G. Kurzman, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Mary J. Theisen, Special Asst. Atty. Gen., St. Paul, for respondent.

Heard, considered, and decided by the court en banc.

COYNE, Justice.

· In its decision in this case, the court of appeals affirmed the convictions of defendant, Dr. James Robinson Poole, M.D., for violating subdivision 1(k) of Minn.Stat. §§ 609.344 and 609.345 [1] but reduced defendant's aggregate sentence from 18 years (six consecutive terms) to 12 years (three consecutive terms). *State v. Poole*, 489 N.W.2d 537 (Minn.App.1992). We granted separate petitions for review filed by defendant and the state. Concluding that defendant received a fair trial and was properly convicted of the offenses in question and that the court of appeals did not err in reducing defendant's aggregate sentence from 18 years to 12 years, we affirm.

Dr. Poole received his license to practice medicine in Minnesota in 1968. In 1971 defendant moved to Wheaton, Minnesota, where he opened a family practice which included obstetrical and gynecological care.

In January of 1990 one of his patients complained to the Minnesota Board of Medical Examiners regarding a pelvic examination performed by defendant. The Board

---

**1.** The statutes make it criminal sexual conduct to accomplish sexual penetration (section 609.-344) or sexual contact (section 609.345) "by means of false representation that the [penetration or contact] is for a bona fide medical purpose by a health care professional."

contacted the Minnesota Bureau of Criminal Apprehension, which began an investigation that resulted in the filing of 17 counts of criminal sexual conduct in the third or fourth degree. A district court jury found defendant guilty of 16 of those counts. The 16 counts were based on defendant's misconduct toward 11 different female patients between the 1987 effective date of Minn.Stat. §§ 609.344, subd. 1(k) and 609.345, subd. 1(k), and 1990.

Of the 11 complainants, 8 were adolescent female patients who saw defendant for birth control services. The remaining complainants were adult women who saw defendant for obstetrical care.

Most of the young women who saw defendant received several gynecological examinations from him. Typically, defendant entered the examination room and locked the door behind him. Defendant then instructed the patient to undress. He remained in the room alone with the patient while the patient undressed and he customarily did not offer a gown or sheet with which the patient could cover herself. Ordinarily, the patient remained naked during the entire examination.

The testimony of the young women indicates that the defendant typically commenced his examination with a breast exam, then proceeded to perform a pelvic exam. During the bi-manual part of the pelvic exam defendant placed two gloved fingers in the patient's vagina. Each of the complainants who saw defendant for birth control purposes testified that during the bi-manual part of the exam defendant repeatedly moved his fingers in and out of her vagina for 10 to 20 minutes. In numerous of these instances defendant also used his thumb to stimulate the patient's clitoris. Three of the complainants testified that this caused them to experience an orgasm during the examination. At the conclusion of the examination defendant often remained in the room while the patient dressed.

Dr. Preston Williams, an obstetrical and gynecological practitioner at the University of Minnesota Hospitals, testified that an entire pelvic examination, properly conducted, usually takes 2 to 3 minutes and that there is no bona fide medical reason for any doctor to move his fingers in and out of the vagina during such an examination. Similarly, there was expert testimony that there is no bona fide medical reason for a doctor to rub a patient's clitoris during a typical pelvic exam.

The three women who saw defendant for obstetrical care had similar experiences. One of them testified that after she became pregnant, defendant told her that he gave pelvic exams on a monthly basis to his obstetrical patients and used a "stretching" procedure to obviate the need for an episiotomy (cutting of the vulva) during child birth and that this procedure involved placing his entire fist inside the vagina. This patient saw a different doctor during the remainder of her pregnancy. The other two women, however, testified that defendant actually used the technique on them. These women also testified that defendant rubbed their clitorises with his thumb during the examinations.

Several experts familiar with the technique testified that they were unfamiliar with any medical reason for inserting a fist into the vagina as a part of the so-called perineal massage procedure, which is the name for the stretching procedure some obstetricians use.

Although defendant contended in the trial court that the statute which he was convicted of violating is unconstitutionally vague, the thrust of the argument here (as well as in the court of appeals) is that the statute was meant to apply only to health care impostors, not to licensed health care professionals, and that since he is a licensed physician, his convictions must be reversed outright because there is no evidence that his conduct violated the statute. Defendant contends that the legislative history supports his argument as to legislative intent.

It appears that the event that prompted legislative action was the well-publicized decision of the Ramsey County Attorney's Office not to prosecute a man who walked into a hospital and posing as a doctor, performed "gynecological examinations"

on patients. Hearing on H.F. 318, H. Jud. Comm., 75th Minn.Leg., March 10, 1987 (transcript of audio tape). It does not follow, however, that the legislature did not intend to make conduct like defendant's criminal as well.

In any event, as Justice Holmes said, "[Y]ou let in intent not to find out what the speaker meant but what he said."[2] If the statute were ambiguous, it would be proper to look to any legislative history to find out what the legislature *said.* But the statute we deal with is not ambiguous: it clearly applies to any act of sexual penetration or contact accomplished by means of a false representation that it is for a bona fide medical purpose. To put it another way, there is nothing in the statute itself to suggest that the "false representation" language relates to the actor's status rather than to the actor's purpose in accomplishing the penetration or contact. The effect on the victim is not lessened by the fact that the false representation is by a licensed health care professional; in fact, that may exacerbate the harm.

■ We also reject any contention that the statute is unconstitutionally vague either on its face or as applied to defendant's conduct.

Since there is no merit to defendant's contention that his convictions should be reversed outright, we address defendant's several arguments in support of his contention that he was denied a fair trial and therefore should be given a new trial.

The most troubling of these arguments relates to the two search warrants obtained by BCA agents and executed at defendant's clinic. The first of these warrants authorized the search for and seizure of "[p]atient lists, registers, or other writings, which identify female patients of Dr. Poole who would have been at least 10 years of age at the time they visited Dr. Poole, including the patient's name, date of birth, address and phone number." The second warrant authorized the search for and seizure of:

Complete patient files of all females with dates of birth between January 1, 1965 and January 1, 1978 who saw Dr. Poole from January 1, 1987 to the present for any kind of family practice services; including any type of family planning and/or birth control consultation, treatment, requests, interviews, services or provisions; whether the family planning and/or birth control services were a part of the appointment or the sole reason for the appointment.

Acting pursuant to these warrants, BCA agents seized the records of 58 patients from defendant's office.

■ Defendant argues that these warrants were too broad and were not supported by probable cause. We have recognized that there is a degree of flexibility to the particularity requirement. In *State v. Hannuksela,* 452 N.W.2d 668, 674 (Minn. 1990), we commented that "A warrant which describes things in broad or generic terms may be valid 'when the description is as specific as the circumstances and nature of the activity under investigation permit.' " [Quoting *United States v. Santarelli,* 778 F.2d 609, 614 (11th Cir.1985)]. In this case, the nature of the activity under investigation did not permit investigative authorities complete knowledge of even the total number of victims. The supporting affidavits for the warrants detailed complaints from several of defendant's patients describing his use of his position as a doctor as long ago as 1980 to commit sexual assault during the course of gynecological exams. Because the examinations were of a very sensitive and personal nature, it seems highly unlikely that all victims would report defendant's conduct on their own initiative. Given the "nature of the activity under investigation," we conclude that the warrants were sufficiently specific. Moreover, we reject defendant's contention that the warrants were not supported by probable cause.

Our concern is not with the violation of any privacy rights of defendant, because the record does not support such a conten-

---

**2.** 1 O.W. Holmes, Jr., Holmes–Pollock Letters 90 (1941). *See also* O.W. Holmes, Jr., *The Theory of Legal Interpretation,* 12 Harv.L.Rev. 417 (1899).

tion, but we are concerned that the patients' privacy interests incident to the doctor-patient relationship are potentially subject to invasion any time searches of the type authorized in this case are conducted. The defendant does not, of course, have standing to benefit from any determination that the privacy interests of his patients were unreasonably invaded by the procedures used. That fact, however, does not mean that there is not cause for concern.

This is not an appropriate occasion for articulating in any detail the safeguards which law enforcement personnel and courts should consider in seeking and authorizing search warrants in a case of this kind or in an analogous context. A list of safeguards to consider might, however, include: centralized review by a high level law enforcement officer or prosecutor of any decision by law enforcement officials to conduct an investigation likely to involve invasion of the privacy rights of innocent third parties; where feasible, initial use of less intrusive investigative techniques (*e.g.*, subpoenas [3]); careful review by magistrates of applications for warrants authorizing searches likely to intrude on privacy rights of innocent third parties; emphasis on particularity in describing the material sought; and finally, use of a procedure whereby papers and records seized are sealed and then reviewed *in camera* by the issuing judge with an eye to protecting the privacy interests of innocent third parties before law enforcement officials are given access to the items seized. *See generally,* R. Goldstock & Steven Chananie, *Criminal Lawyers: The Use of Electronic Surveillance and Search Warrants in the Investigation and Prosecution of Attorneys Suspected of Criminal Wrongdoing,* 136 U.Pa.L.Rev. 1855 (1988); 2 W. LaFave, *Search and Seizure* § 4.1(g) (2d ed. 1987).

■ Defendant also complains about the trial court's admission of expert opinion testimony that the described conduct in the examination of the patients did not serve a "bona fide medical purpose." Specifically,

defendant argues that the witnesses were allowed to give opinion testimony in the form of a legal conclusion on the ultimate issue for the jury. Defendant neither objected at trial to the testimony on this ground nor did he raise the issue in the court of appeals. Furthermore, defendant presented expert opinion testimony on the same issue. In any event, without the aid of expert testimony the jury here would have had no way of knowing whether there was a "bona fide medical purpose" for defendant's conduct, and accordingly the evidence rather clearly was properly admitted pursuant to the Minnesota Rules of Evidence, particularly in view of Rule 704, which provides in effect that the mere fact that expert testimony embraces an ultimate issue does not render the testimony objectionable.

■ Evidence admitted against defendant included other-crime evidence in the form of testimony by his second cousin that while she was a visitor in defendant's home in 1979, when she was 14 years old, (1) defendant performed a gynecological examination on her, at her mother's request, and during the examination made comments indicative of a lack of professional detachment; and (2) on the next day, while they were passengers in the back seat of an automobile, defendant digitally penetrated her. Several years later in a recorded telephone conversation, the defendant admitted the act and that it was wrong but said he was only trying to "give" her "pleasure."

■ The evidence that defendant committed the prior offense was clear and convincing; the evidence was relevant to the issue of intent and motive, and its probative value was not outweighed by its potential for creating unfair prejudice. *State v. Frisinger,* 484 N.W.2d 27 (Minn.1992). It is true that the incident occurred a number of years before the date of the charged offenses, but our cases indicate that the interval between the prior offense and the charged offense is only one factor bearing

---

**3.** *See O'Connor v. Johnson,* 287 N.W.2d 400 (Minn.1979) (case involving search of nonsuspect attorney's office for records of suspect; police should use subpoena rather than search warrant to obtain records in such circumstances).

on the trial court's determination of the relevance of the evidence. *See State v. Filippi*, 335 N.W.2d 739 (Minn.1983) ("[W]e have generally required that the other crime be similar in some way—either in time, location, or *modus operandi*—to the charged offense, although this, of course, is not an absolute necessity.") *See also State v. Crocker*, 409 N.W.2d 840, 841 (Minn.1987).

■ Defendant's final claim of trial error is that he was denied his right to present evidence in his own defense, a right he enjoys under the due process and compulsory process provisions of the fifth and sixth amendments to the United States Constitution and under article 1, §§ 6 and 7 of the Minnesota Constitution.

Seven witnesses, five of whom were licensed nurses, testified at trial that they had received pelvic examinations from defendant and had no complaints about his conduct. After presenting this testimony, defendant made an offer of proof regarding the testimony of his remaining lay witnesses. Several witnesses were prepared to testify regarding the perineal massage defendant had performed on them. Additional witnesses were prepared to testify about pelvic examinations made by defendant; one would have testified that defendant discovered an ovarian cyst during this procedure. Finally, defendant offered to present evidence from patients who had received gowns from him, arguing that the state's evidence of his conduct in that respect amounted to proof of habit which he was entitled to rebut. The trial court excluded the testimony of these additional witnesses.

The court of appeals affirmed the trial court's exclusion of the proffered testimony, holding that there was "no abuse of discretion in these evidentiary rulings." *State v. Poole*, 489 N.W.2d 537, 543 (Minn. App.1992). We agree. The evidence was cumulative because defendant was permitted to explain his own conduct when he took the stand, was permitted to present evidence from an expert witness, and was allowed to present the testimony of seven former patients, six of whom testified they were given gowns. Of course, that defendant did not indulge in sexual misconduct with some, or even most, of his patients does not excuse his criminal sexual conduct with 11 of those patients.

The final contention, this raised by the state, is that the court of appeals erred in reducing defendant's aggregate sentence of 18 years (six consecutive terms) to 12 years (three consecutive terms). We affirm the reduction in sentence. *State v. Norris*, 428 N.W.2d 61, 70–71 (Minn.1988).

In summary, we conclude that defendant received a fair trial, that he was properly convicted of the offenses in question, and that the court of appeals did not err in reducing his aggregate sentence from 18 years to 12 years.

Affirmed.

TOMLJANOVICH, Justice (concurring in part and dissenting in part).

I agree with the majority that the statute prohibits the behavior of Dr. Poole and that his conviction was proper. I do not believe, however, that the court of appeals reduction of the sentence from 18 years to 12 years was appropriate.

A defendant may not be sentenced consecutively if the sentence unfairly exaggerates the criminality of the conduct. *See, State v. Norton*, 328 N.W.2d 142, 146–47 (Minn.1982). Dr. Poole's 18–year sentence did not unfairly exaggerate the criminality of his conduct. Rather, I believe that the court of appeals reduction of the sentence to 12 years *minimizes* the criminality of his conduct. Under the banner of his profession, Dr. Poole used these young women as sexual toys. He appeared to feel that it was incumbent upon him to sexually initiate these young women. This is deplorable conduct.

The trial judge was in the best position to evaluate the criminality of the conduct. It was the trial judge who sat in court during the trial. He observed the defendant, he observed the victims and their families and was better able than the court of appeals to determine the sentence.

In reducing the sentence, the court of appeals decided to compare the sentence to the presumptive sentence for felony murder. If such comparisons are to be made, it would seem more appropriate to compare the sentence to one for *16* felony murders. This was not a one incident, one victim crime. A sentence should be evaluated in relation to the nature of the crime or crimes in each individual case, not by comparing it to the sentence for some other unrelated crime.

I would reinstate the 18–year sentence.