**Gene W. CARPENTER, Petitioner,
Appellant,**

v.

**STATE of Minnesota, Respondent.**

No. A03–490.

Supreme Court of Minnesota.

Jan. 29, 2004.

### ORDER

Based upon all the files, records and proceedings herein,

Mark D. Nyvold, Special Assistant State Public Defender, St. Paul, MN, Attorneys for Appellant.

Mike Hatch, State Attorney General, Thomas R. Ragatz, St. Paul, MN, Norman J. Loren, Kanabec County Attorney, Mora, MN, Attorneys for Respondent.

## OPINION

PAUL H. ANDERSON, Justice.

On March 20, 2001, appellant Gene William Carpenter murdered Mark Place and later that same day murdered Tammy Olson. Carpenter entered guilty pleas to first-degree murder charges in both cases and was sentenced to two consecutive life sentences. Carpenter subsequently petitioned for postconviction relief on several grounds, including attorney-client conflict, judicial bias, vindictive prosecution, and diminished capacity. The court denied his petition and he now appeals, asserting that

the second consecutive life sentence unfairly exaggerates his criminality. We affirm.

On January 26, 2001, the Hibbing police responded to a call from 11–year–old Nicole Carpenter concerning threats made by her father, Gene William Carpenter (Carpenter), against her mother, Tracy Carpenter. Subsequently, Tracy Carpenter petitioned for an order for protection from Carpenter and, on January 29, 2001, the Saint Louis County District Court granted her a temporary order for protection. On February 5, 2001, the court issued an order for protection excluding Carpenter from any residence of Tracy Carpenter—including the family's mobile home in Hibbing—and provided for Carpenter's supervised visitation of Nicole. Carpenter then began living with his sister in Hibbing.

Tracy and Nicole continued living in the family's mobile home until February 23, 2001, when Tracy moved because she had heard that Carpenter had attempted to buy a weapon. Tracy and Nicole moved to a town in another county to live with a relative. Tracy kept the information about where she and Nicole were living secret from Carpenter. She did not even tell her twin sister, Tammy Olson, who lived in nearby Keewatin with her boyfriend, Mark Place. After she left Hibbing, Tracy gave Olson a key to the mobile home and asked Olson to remove Tracy's and Nicole's clothes and other possessions from the home. Olson and Place did this around Friday, March 16, 2001.

Carpenter knew Olson and Place socially and after Tracy moved away he continued to have contact with them. Carpenter somehow learned that Olson and Place had removed things from the mobile home. On the morning of March 20, 2001, Carpenter drove his all-terrain-vehicle from his sister's home to the Olson–Place home. He stated that his purpose was to seek the return of the items removed from the mobile home. Carpenter arrived at the Olson–Place home between 9:45 a.m. and 10:15 a.m. Place was home alone working on the kitchen floor.

According to Carpenter's plea statement, he confronted Place in the kitchen seeking the return of the items Olson and Place had removed from the mobile home and an argument ensued. This argument quickly escalated into a fight between the two men, but Place eventually gave up the fight. Place then took Carpenter to the garage where he said the items taken from the mobile home were stored. When the items in question were not in the garage, Carpenter took Place back into the house and bound him to a rocking chair in the living room using duct tape and cable ties that he had found in the garage. Carpenter eventually unbound one of Place's hands so that Place could smoke a cigarette. Sometime thereafter, Carpenter unbound Place completely and allowed him to go to the bedroom for more cigarettes. Place returned holding a .22 caliber handgun and demanded that Carpenter leave. Carpenter told Place that he had already tried committing suicide and did not care if Place shot him. When Place hesitated, Carpenter overpowered him and the two fell to the floor. At some point during their struggle, Carpenter took the handgun from Place. As Carpenter got up from the floor, he shot Place twice in the chest. Carpenter subsequently placed a T-shirt over Place's head and moved his body to the bedroom where he put it under a bed.

After hiding Place's body, Carpenter left the Olson–Place home and drove Place's car back to his sister's house to retrieve a change of clothing. Still driving Place's car, Carpenter went to Olson's workplace in Hibbing. He arrived at about 2:15 p.m. Although Carpenter did not know which

building Olson worked in, he eventually found her and told her that Place, who usually picked her up from work, had injured his back and asked Carpenter to pick her up. Olson left work with Carpenter around 2:30 p.m.

Olson and Carpenter returned to the Olson–Place home in Keewatin. Once inside the home, Carpenter pushed Olson down on a couch and asked her where Tracy was. Olson responded by asking where Place was, but Carpenter refused to tell her unless she first told him where Tracy was. Olson told him that Tracy was with Carpenter's half-sister who lived north of the Twin Cities. At some point during this confrontation, Carpenter bound Olson's wrists using duct tape. He then placed duct tape over her mouth because she was screaming. Olson eventually agreed to help Carpenter find Tracy, so Carpenter removed the restraints. Carpenter and Olson then left the house at approximately 4:15 p.m. in Place's car with Olson driving. Carpenter brought with him the .22 caliber handgun that he had used to shoot Place and also a nine-millimeter handgun that he had found in Place's bedroom.

Carpenter and Olson drove south on Highway 65 toward where his half-sister lived. After a while, they stopped at a gas station to ask for directions and Carpenter discovered that they had traveled too far south. Olson then asked Carpenter to drive because she did not have her glasses with her. They then turned around and drove north. They still could not find the home of Carpenter's half-sister and, because it was getting foggy, Carpenter decided to return to Keewatin. At approximately 10:00 p.m., Carpenter pulled off the highway near Mora in Kanabec County. The property where he pulled off contained an unoccupied trailer home, a shed, and a portable bathroom. Carpenter and

Olson remained inside the car and talked. Carpenter told Olson that he was sad and feeling down over Tracy leaving him. Olson then told Carpenter that Place was "screwing Tracy" and, after hearing this, Carpenter became angry.

At some point, Olson got out of the car to use the portable bathroom. Carpenter also got out of the car and brought the .22 caliber handgun with him. He subsequently stated that he brought the handgun with him because he had decided to kill Olson. After Olson used the portable bathroom, she and Carpenter were behind the shed with Olson standing in front of Carpenter. Olson continued talking about Place "sleeping with" Tracy. Carpenter then shot Olson four times. Three of the shots hit Olson in the middle of her back and a fourth shot hit her in the back of the head. After shooting Olson, Carpenter returned to the car and drove away.

Carpenter eventually arrived at his half-sister's home between 1:30 and 2:00 a.m. on March 21. Carpenter asked where Tracy was staying and stated that he wanted to see her. His half-sister denied knowing where Tracy was staying. She then called the police because she feared Carpenter was suicidal, but Carpenter left before the police arrived. He returned to his half-sister's home at about 7:00 a.m. She again called the police. Carpenter was still at his half-sister's home when the police arrived and took him into 72–hour protective custody.

Later that morning, a neighbor, checking on the property where Carpenter and Olson had stopped, discovered Olson's body. The neighbor called the Kanabec County Sheriff. Officers responded to the call, secured the area, and an investigation ensued. Also on the morning of March 21, an Itasca County deputy sheriff entered the Place–Olson home in response to a request from Tracy for a welfare check on

Olson. The deputy noticed an odor of decomposition and signs that a struggle had apparently occurred. The deputy then discovered Place's body.

Carpenter became a suspect in the deaths of Olson and Place. Apparently while Carpenter was still in protective custody, he was formally arrested. After being charged in connection with the deaths of both Place and Olson, Carpenter was admitted to the Minnesota Security Hospital in Saint Peter. Doctors at the hospital evaluated Carpenter's mental health status with respect to his competence to stand trial and his mental state at the time of the murders. The doctors concluded that there was no evidence that Carpenter exhibited any psychotic disorder and no evidence of "gross disturbances in thinking, perception, or reality testing."

In Kanabec County, Carpenter was charged with first-degree felony murder (kidnapping), first-degree premeditated murder, second-degree intentional murder, second-degree intentional felony murder, and possession of a firearm by a felon. He was also charged with first-degree murder in Itasca County. Carpenter agreed to plead guilty to both first-degree murder charges in exchange for dismissal of other charges. His plea was received in Kanabec County on November 26, 2001. Earlier, he had pleaded guilty in Saint Louis County to charges of making terroristic threats and being a felon in possession of a firearm stemming from the January incident in Hibbing. Carpenter was sentenced to a total of 60 months for those offenses on October 5, 2001.

On December 10, 2001, Carpenter was sentenced in Itasca County to a life sentence for the first-degree murder of Place to be served consecutive to the Saint Louis County sentences for making terroristic threats and being a felon in possession of a firearm. The next day, Carpenter was sentenced in Kanabec County to another consecutive life sentence for the murder of Olson. The Kanabec County District Court found that the murders of Place and Olson were separate behavioral incidents. The court noted that the murders took place at least eight hours and hundreds of miles apart and Carpenter had "plenty of time to cool down" between the two murders. The court found it important that Carpenter had a "long history of violence directed at family members." While Carpenter had denied during his plea hearing that he had shot Olson at close range, the court noted that the physical evidence—powder burns on Olson's jacket—suggested he shot her "at close range, in the back, in what could certainly be termed an execution-style killing." The court also stated that Carpenter showed no mercy to Olson even though he had "[p]lenty of opportunities for a change of mind" after killing Place. The court reasoned that a consecutive life sentence was appropriate because a concurrent life sentence would "impose no penalty for the deliberate, intentional killing of his second victim."

Carpenter filed a petition for postconviction relief seeking vacation of the conviction, modification of his second life sentence from a consecutive to a concurrent sentence, a new trial, an evidentiary hearing, and civil commitment. His petition was made pro se and reviewed by the same judge who presided over his plea and sentencing hearings. Carpenter alleged a number of grounds for relief including attorney-client conflict, judicial bias, vindictive prosecution, and diminished capacity. The postconviction court ruled that Carpenter's allegations lacked any factual support in the record and denied the relief requested. On appeal, Carpenter argues that the second consecutive life sentence unfairly exaggerates his criminality and requests that we vacate this second life

sentence with direction on remand for entry of a concurrent life sentence.

■ A postconviction court's decision to deny a petition will not be reversed absent an abuse of discretion. *Dukes v. State,* 660 N.W.2d 804, 810 (Minn.2003). Although Carpenter's pro se petition before the postconviction court and that court's order do not specifically frame the issue as one of unfair exaggeration of criminality, we agree with the statement of Carpenter's appellate attorney that, "in light of the sentence-related issues" Carpenter raised before the postconviction court, the argument that consecutive sentencing unfairly exaggerates Carpenter's criminality "is the best way to state the issue for appeal."

■ When a defendant is convicted of multiple first-degree murders, the district court has discretion to make the life sentences for those convictions concurrent or consecutive. Minn.Stat. § 609.15, subd. 1 (2002); *State v. Brom,* 463 N.W.2d 758, 765 (Minn.1990). When reviewing the imposition of consecutive life sentences, we consider whether consecutive sentences "result in punishment grossly out of proportion to the defendant's culpability." *Bangert v. State,* 282 N.W.2d 540, 547 (Minn.1979). There is no abuse of discretion when the consecutive sentence does not exaggerate the defendant's criminality. *See, e.g., id.* (holding that consecutive life sentences were "commensurate with culpability and not an exaggeration of the defendant's criminality"). In determining whether a consecutive sentence unfairly exaggerates a defendant's criminality, we are guided by past sentences received by other offenders for similar offenses. *State v. Wilson,* 539 N.W.2d 241, 246 (Minn. 1995); *State v. Vazquez,* 330 N.W.2d 110, 112 (Minn.1983). We have the discretion to modify a sentence in individual cases when modification appears to be in the interests of fairness and uniformity. *Vazquez,* 330 N.W.2d at 112.

We have "consistently affirmed the imposition of consecutive life sentences where a defendant was convicted of multiple victim homicides." *Wilson,* 539 N.W.2d at 246. Carpenter does not present a persuasive basis for treating his sentence differently from other cases. It is noteworthy that we have affirmed consecutive life sentences in numerous cases where there were multiple first-degree murders involving victims who were murdered as part of the same behavioral incident. *See, e.g., Bangert,* 282 N.W.2d at 547. Here, Carpenter's murders were separate behavioral incidents. As the district court noted, the time and distance between the murders certainly gave Carpenter the opportunity to "cool down" and "change his mind." Thus, the circumstances of Olson's murder indicate that it was not an abuse of discretion to give Carpenter a consecutive sentence.

■ Carpenter also asks that we hold that his mental health at the time of the murders mitigated his crimes "to the extent that it was unfair, excessive, and unreasonable and inappropriate" to make his second life sentence consecutive to the first life sentence. Carpenter supports this claim by noting that he had checked himself into the mental health ward of a hospital, attempted suicide several times during the months preceding the murders, and was using the prescription drug Paxil. Carpenter relies on *State v. Norris,* 428 N.W.2d 61 (Minn.1988), to support this claim. In *Norris,* we were asked to review the fairness of five consecutive 60-month sentences for second-degree assault and a consecutive life sentence for first-degree murder. *Id.* at 70. Although we noted that the sentencing was "technically permissible," we concluded that, on the facts and circumstances there, such sentencing

would unfairly exaggerate the criminality of the defendant's conduct. *Id.* at 71. In reaching this conclusion, we reviewed other cases involving aggravated robbery, assault, and multiple victims where we affirmed consecutive sentences. *Id.* at 70–71. We noted that none of those other cases involved more than three multiple sentences and most involved two. *Id.* at 71. We held that five consecutive 60–month sentences added to a life sentence unfairly exaggerated that defendant's criminality. *Id.* We then modified the total sentence by ordering that three of the five 60–month sentences be served concurrently. *Id.*

*Norris* does not support Carpenter's argument. First, the sentences in *Norris* were for crimes against six different victims during the four to seven minutes of an armed robbery. *Id.* at 64. The situation here is distinctly different as it involves significant temporal and physical separation between the murders for which Carpenter is consecutively sentenced. Second, *Norris* does not support Carpenter's claim that his mental health should serve to mitigate the total sentence. *Norris* dealt with exaggeration of criminality based on a comparison with other cases and the total number of consecutive sentences in those cases—not a claim of mental impairment. *Id.* at 71. Third, even if we were to follow the same process as we did in *Norris,* we would not modify Carpenter's sentence because it is consistent with sentences imposed in other cases involving multiple first-degree murder victims. Indeed, "[t]ime after time [we have] affirmed consecutive sentences for multiple murders." *State v. Willis,* 559 N.W.2d 693, 701 (Minn.1997). Finally, at sentencing, the district court considered information relevant to Carpenter's mental health and we are not presented with sufficient evidence to conclude that either the court abused its discretion in sentencing Carpen-

ter to a second consecutive life sentence or that a second consecutive life sentence unfairly exaggerated his criminality.

For the foregoing reasons, we conclude that the grounds asserted by Carpenter in support of his claim that his second life sentence unfairly exaggerated his criminality lack merit. Therefore, we hold that the postconviction court did not err when it denied Carpenter's petition for postconviction relief.

Affirmed.