**Larry Gene RACE, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**No. C7–92–1961.**

Supreme Court of Minnesota.

Aug. 13, 1993.

---

**1.** Some attorneys advertise in the yellow pages of the telephone book that they provide the first consultation free.

Richard P. Clem, Clem & Crosby, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Alan L. Mitchell, St. Louis County Atty. and John E. DeSanto, Asst. County Atty., Duluth, for respondent.

TOMLJANOVICH, Justice.

We are asked to decide whether the trial court abused its discretion in deciding that Larry Race was not entitled to a new trial based upon newly discovered evidence. We believe the trial court did not abuse its discretion in denying the new trial and affirm.

This case has been here twice before,[1] thus we will only summarize the facts. On

---

1. *See State v. Race,* 383 N.W.2d 656 (Minn.1986) ["*Race I*"] and *Race v. State,* 417 N.W.2d 264

the night of May 11, 1982, Larry and Deborah Race dined out to celebrate their 14th wedding anniversary. After dinner, they went for a ride on their boat. Deborah's body was found on the shore of Lake Superior the following afternoon. Race was subsequently charged with the murder of his wife.

At trial, the defense theory of the case was as follows: A leak developed in the water jacket of the engine. Appellant was able to repair the leak, but could not restart the boat. He then turned on the bilge pump to remove the water that was on the floor of the boat because of the leak. The pump made a sucking noise on the floor of the boat. Appellant alleged that this made his wife hysterical because she thought the pump was pulling the floor of the boat loose.

Appellant claims his wife then insisted that she leave the boat. She helped him into his dry suit. Appellant claimed that he had two rubber rafts on the boat. He tried to inflate one, but could not. He inflated the other one. Deborah entered it, but when he entered, it took on some water. This again frightened her, and she would not let him ride in the boat with her.

Because of these fears, appellant claimed he then attempted to tow the raft to the shore, as he had done with their children once before when the boat had taken on water. He began swimming to shore, towing the raft behind him. His hands became cold, however, because he was not wearing his diving gloves. He stopped towing to warm his hands. While he was rubbing them together, the raft drifted away. He

yelled to her to go towards shore. He swam back to the boat. This time the engine started. He signaled for help with flares. Then he cruised for 20 minutes, searching for his wife. He did not find her and so went to shore for help, successfully contacting the Coast Guard and the Civil Air Patrol shortly after 4 o'clock in the morning. They began a search for Deborah without success.[2] Around 5 o'clock the next day, Deborah's body was found washed up on shore.

The state's theory differed. It alleged that when defendant was towing his wife, he slashed the underside of the raft, with the intention of drowning her. Abundant evidence supported the state's theory. Significantly, when officers boarded the boat on May 12, they found no indications that it had been in any danger of sinking. The bilge pump was functional enough to have pumped out any water that had been in the boat. The officers found a rubber raft on the boat with numerous cuts in several areas including the air chambers. The cuts were on the underside of the raft, consistent with having been made with an upward thrust of a knife-like instrument while the raft was inflated. During the boat inspection, officers found several gallons of water in the raft—this was in contrast to defendant's first statement to the police in which he said that raft had never entered the water. The officers also found the caps of the air chambers *closed*—again in contrast to Race's first statement in which he said that after his failed attempt to inflate the raft he had cast it aside,

(Minn.1987) ["*Race II*"].

**2.** The coast guard conducted an extensive search. Lieutenant Carl A. Swedberg, the Coast Guard Group Commander for Coast Guard Group Duluth testified at trial about the nature of the search. He described in detail the search and rescue mission conducted by the Coast Guard the day of May 12, 1982 when the report was received that a woman was missing. They used 21–foot, 41–foot and 44–foot boats to search. One boat was dispatched at 2 a.m. upon the sighting of flares. Thus, by the time the report came in, that boat had already been dispatched for about two hours. Extra employees were called in to handle all of the vessels.

The Coast Guard worked with the Sheriff's Department to try to narrow the search area. The Guard also used two civil air patrol planes and a helicopter. The 41–foot vessel was engaged for the longest period of time, from approximately 2 a.m. until 5 p.m. the next afternoon. Mr. Swedberg was on duty for the entire period the search was in process. Around 5 p.m., the Coast Guard learned that Deborah Race's body had been located. The search was discontinued. No raft was found by the Coast Guard. Commander Swedberg also testified that no raft was ever found by the Coast Guard similar to the first raft owned by Race. Trial Testimony of Carl A. Swedberg, Vol. V., pp. 908–46.

presumably without having reason to close the caps.

Thus, a central issue at trial was whether there was a second raft, or whether the slashed raft was Race's only raft. Despite the extensive search and attendant newspaper, radio and television coverage, a second raft was not located. The jury found Race guilty of first degree murder on November 17, 1983.

In this, his fourth petition asking the trial court for postconviction relief, he requested a new trial based on new evidence: two women had come forward and testified that they found a raft in 1983 which might have been Race's second raft. On December 18, 1991, petitioner's case was featured on a television show. The show had a toll-free number viewers could call if they had any information about the featured cases. Caroline Shattuck of Minneapolis called the number and reported that on or about May 19, 1983, she had found a raft similar to the one Race had described as his second raft.

The producers of the show relayed this information to Race's attorney. He contacted Shattuck and deposed both Shattuck and her sister, Katherine Tinsley. They testified that they had found a yellow and blue rubber raft in May of either 1982 or 1983.[3] At the hearing on this matter, Shattuck said they found it in Duluth. At her earlier deposition, however, she testified that they had found it in the St. Croix River. Shattuck testified that it looked "like it had been there a while." At the hearing, Tinsley testified that the raft was partially in the water.

Shattuck and Tinsley testified that they did not come forward with the evidence earlier because they had not heard of this case until they saw it featured on television. Shattuck testified that she had taken the raft home and cleaned it up for children to play with in a local, neighborhood pool. She testified that the last time she saw the raft was when she stowed it in her mother's basement several years ago. She no longer has the raft, nor does she know its location.

Race moved for a new trial based upon this new evidence. The trial court held a hearing and subsequently denied the motion.

## I.

■■■■ In deciding whether to grant a trial based upon newly discovered evidence, trial courts are to apply a four-part test:

> Generally, in order to obtain a new trial on the ground of newly discovered evidence, the defendant must establish (1) that the evidence was not known to him or his counsel at the time of trial, (2) that his failure to learn of it before trial was not due to a lack of diligence, (3) that the evidence is material (or as we have sometimes said, is not impeaching, cumulative or doubtful), and (4) that the evidence will probably produce either an acquittal at a retrial or a result more favorable to the petitioner.

*Race II*, 417 N.W.2d at 266 (citations omitted). Furthermore,

> [t]he decision whether to grant a new trial based upon a claim of newly discovered evidence rests in the first instance with the trial court and we will not disturb the decision unless there is an abuse of discretion.

*Race II*, 417 N.W.2d at 266, citing *Berry v. State*, 364 N.W.2d 795, 796 (Minn.1985). It is undisputed that the first two elements are met. The existence of this newly found raft was not known to Race's counsel at the time of trial. It is also clear that this lack of knowledge was not due to a lack of diligence.

■■■■ As to the third element, we agree with the appellant that the presence of a raft which could, in theory, be the lost "second raft" is material: whether the second raft existed was a critical issue at the trial. *See Race I*, 383 N.W.2d at 660. However, we have stressed that in order for a new trial to be granted, new evidence

---

**3.** Shattuck also testified that another friend had been with them but she did not remember her last name.

must be more than merely material, the evidence must also not be doubtful. In other words, the evidence must be credible. The trial court specifically found that the evidence of Shattuck and Tinsley was not credible.[4]

■ Our review of the record convinces us that the trial court did not abuse its discretion in reaching this conclusion. Shattuck and Tinsley's testimony was confusing. Among other things, they testified to not being able to distinguish between a river and a lake, not knowing where Minnesota ends and Wisconsin begins and indeed thinking that Duluth was in Wisconsin. Shattuck's testimony is *very* confusing on this point, leaving one with the impression that she thinks there are actual boundary lines drawn on the ground between states:

Q [Mr. DeSanto] * * * You told Mr. Clem under oath that you were sure it was Wisconsin, not Minnesota, right?

A Yes.

Q So you knew the difference between Wisconsin and Minnesota back then, didn't you?

A Well, it's still the same place, isn't it? Minnesota is Minnesota. There's a boundary line between them all, am I right?

Transcript of Hearing at 95. Shattuck and Tinsley also testified that they now were sure they had found the raft in Duluth because they had stopped at an information center outside of Duluth and specifically remembered seeing a "Do Not Feed the Birds" sign there. At the hearing, however, the state presented the testimony of John Cavanaugh, a Minnesota Department of Transportation employee, and former supervisor of the Thompson Hill Travel Information Center during the relevant time period. He testified that the "Do Not Feed the Birds" sign did not exist during his tenure as supervisor of the Information Center. Laura Shaw from the Minnesota Office of Tourism also testified on behalf of the state. Her office is located in the Thompson Hill Travel Information Center. She testified that the "Do Not Feed the Birds" sign was not placed at the Travel Information Center until July of 1991.

Shattuck and Tinsley's testimony is also unclear as to precisely when they found the raft. At times they have testified that it was in 1982, at other times that it was in 1983. Given the many discrepancies in the story, the trial court did not abuse its discretion in concluding that it was not credible.

■ The trial court also did not abuse its discretion in concluding that the new testimony would probably not produce a more favorable result at a new trial. Even if a new trial were held, including Shattuck and Tinsley's testimony about having found a second raft, a significant portion of the trial would probably be dedicated to determining whether or not the discovered raft was in fact Race's second raft. Given the massive search, it seems highly probable that the prosecution could convince a jury that any raft the women found was not Race's but perhaps another raft lost after the search concluded. Except for the general description, there is no evidence tying the raft to Race.

In the larger context, it is noteworthy that this court found that the evidence at the original trial regarding the second raft was not credible:

At the trial, appellant's brother and his young daughter testified to knowing that appellant possessed a second raft. Although from the outset it was obvious to all the existence of the second raft was of crucial importance in resolving what happened on the fateful night, neither of the two witnesses had mentioned the alleged second raft's existence until shortly before trial which occurred one year and a half after Deborah's death.

---

**4.** The trial judge went further than merely making a finding that the evidence was not credible. In his memorandum, he stated:

[T]he Court notes that the witness produced by the Petitioner, and the confused, contradic-

tory, and inherently incredible nature of their testimony comes close to the weakest presentation of evidence that the undersigned has ever heard.

*Race*, 383 N.W.2d at 660 (Minn.1986). Thus, in our view, compelling evidence has never been put forth to substantiate that a second raft existed. Again, this supports the trial court's conclusion that a new trial was not warranted.

The trial court did not abuse its discretion in denying the motion for a new trial.

Affirmed.