STATE of Minnesota, Respondent,

v.

Shannon Noah BOWLES, Appellant.

No. C0–93–2105.

Supreme Court of Minnesota.

April 21, 1995.

John M. Stuart, State Public Defender, Evan W. Jones, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., J. Michael Richardson, Mark V. Griffin, Asst. County Attys., Minneapolis, for respondent.

## OPINION

PAGE, Justice.

Shannon Noah Bowles was convicted by an anonymous Hennepin County jury of premeditated first-degree murder under Minn. Stat. § 609.185(1) (1994), first-degree murder of a peace officer under Minn.Stat. § 609.185(4) (1994), and attempted first-degree murder under Minn.Stat. § 609.17 (1994) in connection with the assassination-style murder of Minneapolis Police Officer Jerry Haaf and the wounding of Gerald Lubarski during the early morning hours of September 25, 1992. The trial court sentenced Bowles to two concurrent terms of life imprisonment on the first-degree murder convictions, and a consecutive term of 180 months' imprisonment on the attempted first-degree murder conviction.

In this appeal Bowles contends: his right to a fair trial was violated when the trial court impanelled an anonymous jury; the evidence presented at trial is insufficient to sustain the convictions; and the trial court erroneously refused to reconsider his motion for a new trial. Bowles raises a number of additional issues in his *pro se* brief. We have reviewed each of those issues and are satisfied that any claimed error was, at most, harmless.[1] Our review of the record brought to our attention an issue, not raised by Bowles, involving possible juror misconduct. Because we lack a sufficient record from which to determine whether juror misconduct occurred, we retain jurisdiction and remand for further proceedings as discussed herein.

Between 1:30 and 2:00 a.m. on Friday, September 25, 1992, two black males[2] walked into the Pizza Shack restaurant at

---

1. Among the issues raised in Bowles' *pro se* brief is the bald assertion that his equal protection and due process rights were violated because he was subjected to a "racist proceeding." He does not, however, direct our attention to any facts in the record or any specific occurrences during his trial which support that assertion. General allegations of error, without detailing specific factual or legal errors, do not aid our review of the lower court's proceedings and, consequently, almost never aid an appellant's cause. Therefore, we will not consider any claim lacking supporting argument or authority unless prejudicial error appears obvious upon inspection of the record. *State v. Lipscomb*, 289 Minn. 511, 513, 183 N.W.2d 790, 792 (1971). Our review of the record indicates that while racial tension surrounded the murders of Officer Haaf and Ed Harris, and the trials of those accused in their murders, there is nothing to support Bowles' general allegation that he was subjected to a "racist proceeding." The idea that a racist proceeding is the sole cause of Bowles' predicament is specious.

This court is "not unmindful of nor insensitive to" the body of evidence relating to racial bias in our judicial system. *State v. Williams*, 525 N.W.2d 538, 549 (Minn.1994). Indeed, in the Minnesota Supreme Court Task Force on Racial Bias in the Judicial System *Final Report*, we have identified problems in the judicial system that cause unfairness to people of color. To the extent that specific allegations of racial bias are made regarding the judicial system, we will address them through our role as administrator for the judicial system and through our constitutional responsibility as Minnesota's highest court. Simply playing the race card, without more, does not aid us in this task. As one noted scholar has explained, it is not helpful, and can even be damaging, when "rhetoric becomes a substitute for analysis." Cornel West, *Race Matters* 42–43 (1993).

2. One witness indicated a third black male entered the Pizza Shack at the same time.

Lake Street and 17th Avenue in Minneapolis. There were 10 to 15 people in the restaurant at the time, including Officer Haaf, who was in uniform, on duty, and seated at the "officers' table"[3] having coffee with Gerald Lubarski and Margaret Hapsch. The two men approached Officer Haaf from behind. Without warning or provocation, they pulled out handguns and at close range fired two to four shots at Officer Haaf's back.[4] Two bullets entered Officer Haaf's back and he died a short time later. Lubarski suffered a bullet wound to his left arm. Hapsch was not injured.

The police never recovered the guns used in the shooting. However, the medical examiner who conducted the autopsy on Officer Haaf's body determined the gunshot wounds were caused by a large caliber handgun, as opposed to a small caliber handgun like a .22. Forensic tests revealed that bullets and bullet fragments recovered from the restaurant and Officer Haaf's body were consistent with .38 and .357 caliber ammunition, and appeared to have been fired from revolvers.[5] Further, the absence of shell casings at the scene led police to conclude the weapons used in the shooting were revolvers.

According to the state's theory of the case, Officer Haaf was killed by members of the Vice Lords street gang[6] in retaliation for the alleged beating of a blind, elderly black man by Metropolitan Transit Commission police. When they learned of the alleged beating, several Vice Lords members went to a meeting of police and community members that was taking place at Minneapolis North High School. After the meeting, a group, including Bowles, Mwati McKenzie, A.C. Ford, Montery Willis, and a 15–year–old named Richard,[7] met at the home of Sharif Willis[8] to plan some form of retaliation for the alleged beating. After rejecting a suggestion that they shoot a bus driver, they settled on a plan to "do the Pizza Shack."

With Ford driving Bowles and Montery Willis in a Ford Bronco and with Richard driving McKenzie in a rented tan, four-door Ford Granada, the group left Sharif Willis' house, traveled to within one block of the Pizza Shack, and dropped off Bowles and McKenzie. After the shooting, Bowles and McKenzie ran one block to the home of Loverine and Ed Harris. Ed Harris was a member of the Vice Lords. Upon arriving at the Harris home, Bowles and McKenzie changed their shirts, shoes, and hats, disposed of their guns, and washed their hands. Richard arrived at the Harris home shortly thereafter, and the three of them departed.

Police arrived at the Pizza Shack within minutes of the shooting and immediately began their investigation. Between 3:00 and 3:30 a.m. four officers went to the Harris home and, with the Harris' consent, searched the house, but found nothing incriminating. Two weeks after the Haaf murder, Ed Harris was found shot to death in a south Minneapolis alley.[9] Police theorized that Ed Harris was killed by other Vice Lords members because they were afraid he was giving police information about the Haaf murder.

Key testimony in support of the state's theory of the case came from four individu-

---

3. The "officers' table" was a table in the Pizza Shack generally reserved for police officers.

4. When initially questioned by the police after the shooting, Hapsch indicated she had seen only one gunman, and that she could not identify him.

5. Detectives also recovered one .22 caliber bullet from the restaurant, but were unable to determine whether it had been fired from a handgun.

6. Bowles and Eugene McDaniel, one of the state's witnesses at trial, acknowledged during their testimony that the Vice Lords are a street gang.

7. According to Richard, a man and woman, neither of whom he knew, were also present.

8. Two witnesses, including Richard, identified Sharif Willis as the head of the Vice Lords in Minneapolis.

9. Although they discovered nothing during their initial search of the Harris home, police searched the home again after Ed Harris' murder and recovered two pairs of tennis shoes, a baseball cap, and some ammunition from the house. One pair of shoes was a size 11; Bowles' feet measured size 11 and 11½. The second pair was a size seven; McKenzie's feet were size 9½ and 10. When McKenzie was arrested, however, he was wearing size seven shoes.

als. Richard testified about the meeting at the Willis house, the car ride to the Pizza Shack, and the events at the Harris home after the shooting. Loverine Harris testified about the events surrounding Bowles', McKenzie's, and Richard's arrival at her home and her subsequent identification of Bowles to the police. Eugene McDaniel, a Vice Lords member who shared an apartment with Bowles and Steve Morrison, testified that Bowles' weapon of choice was a .357 revolver in which he used .38 caliber ammunition and about a telephone conversation he had with Bowles the evening after the Haaf murder.[10] Percy Melton, an inmate at the Hennepin County Jail on an assault and battery charge unrelated to the Haaf murder, testified about various events that occurred and conversations he had with Bowles while they were incarcerated together.

Richard, Loverine Harris, McDaniel, and Melton each received some benefit from the state as a result of testifying at trial. In exchange for Richard's agreement to testify in the trials of those accused of the Haaf and Harris murders, the state moved Richard's family, at the family's request, and agreed not to refer Richard for prosecution as an adult for the Haaf murder. Because Loverine Harris was concerned about her family's safety, she and her children were relocated at the state's expense. In exchange for McDaniel's cooperation in the prosecution of those accused of the Haaf murder, the state dismissed a state charge against him involving a 1992 aggravated robbery and arranged for his sentence on a federal firearms charge to be reduced from a possible sentence of life imprisonment to, at most, 77 or 92 months' imprisonment. Melton's plea agreement for the assault and battery was rejected prior to Melton providing information about Bowles to the police. However, in exchange for Melton's agreement to testify in the prosecution of Bowles and others accused of the Haaf murder, the state entered into a plea agreement, subsequently accepted by a court, that reduced his possible 98 month prison sentence to 12 months in the workhouse and 10 years' probation. The jury,

through either direct or cross-examination, was made aware of the benefits received by the state's witnesses.

Bowles testified in his own defense at trial. According to Bowles, he spent September 24 collecting drug-related debts. Throughout the day, he and Morrison stopped by Sharif Willis' house. During their third visit, at approximately 9:00 p.m., they found a number of Vice Lords members in a heated conversation about retaliating against the police over the beating of a blind, elderly black man. Bowles drove Morrison home and returned to the Willis house in Morrison's Ford Bronco. Bowles, Montery Willis, and Willis' girlfriend then left to collect money owed Willis. After collecting that money, they drove the Bronco to Curley's, a restaurant located down the block from the Pizza Shack. They arrived at Curley's between 12:15 and 12:30 a.m. Approximately 10 minutes after they arrived, Willis left in the Bronco to drive his girlfriend home and never returned. Ed Harris entered Curley's at about 1:15 a.m. Fifteen to 20 minutes after Harris left, Bowles heard two "pops," went to the restaurant's front door to investigate, and saw some men running from the Pizza Shack while a police car was "screaming" toward it. Bowles then saw Ed Harris and Richard walking toward the Harris home. Bowles eventually walked home to his apartment near 43rd and Minnehaha.

Bowles testified that the next morning Montery Willis returned Morrison's Bronco to Bowles and told Bowles about the Haaf murder, whereupon Bowles decided to temporarily shut down his drug-dealing business. He and Montery Willis went to Sharif Willis' house, where Bowles borrowed a car. The two then went to collect more drug debts. Bowles returned home during the afternoon, packed some clothes, picked up a girlfriend, went shopping, rented a room at a local motel because he did not want to continue sleeping at his apartment, and returned to Sharif Willis' house, where he was arrested by the police at approximately 9:30 p.m.

---

10. Because he had been previously arrested for illegally possessing a firearm, McDaniel was in police custody at the time of the Haaf murder and his subsequent phone conversation with Bowles.

Trial commenced on June 21, 1993, and the jury retired on June 30. On July 1 Juror # 4 requested a private meeting with the trial judge. The judge, after getting agreement from counsel for Bowles and the state, met alone with the entire jury. At that meeting Juror # 4, apparently the only black member of the jury, disclosed that other jurors were suggesting to her that if Bowles were white, she would "have had a different verdict" during deliberations. After discussing the matter with the judge, the jury retired for the evening. On July 4, the jury returned its guilty verdicts.

On July 19 Bowles filed two motions. One was for a judgment of acquittal or, alternatively, a new trial. The other was for a *Schwartz* hearing to investigate possible juror misconduct. At Bowles' sentencing hearing on August 9, the trial court denied both motions. Thereafter, Bowles filed a motion for reconsideration of the motion for a new trial on grounds of newly-discovered evidence and recanted testimony. The trial court denied Bowles' motion for reconsideration. This appeal followed.

We turn first to the issues raised by the anonymous jury. Prior to Bowles' trial, the state moved to have an anonymous jury impanelled. Bowles tentatively agreed to the anonymous jury, but on the morning voir dire commenced, Bowles changed his position and objected to the anonymous jury. The trial court overruled Bowles' objection, explaining:

Specifically, I'm going to find that there are exceptional circumstances peculiar to this case, those exceptions and circumstances involve the, at the very least, the violence associated with what occurred or is alleged to have occurred after the killing of Officer Haaf, specifically, the violence associated with Mr. Harris.[11]

In its initial comments to the venire panel, the trial court informed the prospective jurors they would remain anonymous. In explaining the reason for their anonymity, he said:

You will note that there is no place on the questionnaire for you to state your name. Indeed I believe that you were already told that for the entire time that you're involved in this jury selection process and for the trial, for those of you who are selected as jurors, you will be using only the numbers assigned to you. Only my clerks and the head of the jury office know your names. The reason for that anonymity is so that you will not be bothered by people from the media or anyone else during the jury selection process, during the trial or after the trial.

You are all ordered specifically not to reveal your true names, addresses or telephone numbers or employers to anyone involved in the case. * * * I want you to know that I've spoken to other jurors who have utilized this system, the system that we're using in this case, and they were very, very comfortable with it. They particularly liked the fact that they didn't have to explain to friends or colleagues or even relatives what they were doing and that they weren't bothered at all by the media.

During jury selection, there was extensive voir dire [12] conducted by the court and counsel for both Bowles and the state. The issue of anonymity came up with 5 of the 44 prospective jurors questioned. Of those five, two were accepted by Bowles and the state, and impanelled by the court. There is no evidence in the record that any of the impanelled jurors inferred from their anonymity that they were in danger from Bowles or that Bowles was guilty.[13] Nor is there any evidence in the record that suggests in any other way that the impanelled jury was not impartial or presumed Bowles to be guilty.

---

11. After trial, in response to Bowles' motion for a new trial, the trial court also indicated, "The fact is that the anonymity was provided as much for the protection from the press as any other reason, and that is a proper basis for same."

12. Prospective jurors were required to fill out a 26–page, 108–question jury questionnaire. Voir dire lasted 5 days and is contained in 908 pages of transcript in 3 volumes.

13. Bowles concedes there is no "concrete evidence" of any jurors inferring from their anonymity that they were in any danger from him or that he was guilty.

After voir dire, the trial court instructed the impanelled jurors as follows:

> For reasons which I've already discussed with you, you will maintain your anonymity during this trial by being referred to only by number. If among yourselves you want to give some identification other than your real names such as a nickname, that's up to you. If necessary I will address you only by your juror number.

At the close of the trial, the state proposed the following addition to the standard jury instruction on the presumption of innocence: "You are further instructed that the fact that the jury selection process which has been conducted anonymously cannot be considered by you as in any way suggesting guilt." Bowles requested that this language be excluded from the instruction, and the trial court complied with his request.

■ Bowles argues he was denied the fundamental right to a trial by an impartial jury because the impanelling of an anonymous jury destroyed his presumption of innocence. Both the United States and Minnesota Constitutions guarantee criminal defendants a fair trial by impartial jury. U.S. Const. amend. V, VI, and XIV; Minn. Const. art. I § 6; *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976); *State v. Hamm*, 423 N.W.2d 379, 385 (Minn.1988). Where a criminal defendant has been denied the fundamental right to a fair trial, we will grant a new trial. *State v. Harris*, 521 N.W.2d 348 (Minn.1994).

■ The presumption of innocence is a basic component of the fundamental right to a fair trial. *Williams*, 425 U.S. at 503, 96 S.Ct. at 1692; *State v. Wolske*, 280 Minn. 465, 472, 160 N.W.2d 146, 151 (1968). Because our criminal justice system "rests on the basic assumptions that every person accused of a crime is presumed innocent and that his legal guilt must be established in an adver-

sary proceeding in which the state has the burden of proof," *id.* at 472, 160 N.W.2d at 151, enforcement of the presumption of innocence " 'lies at the foundation of the administration of our criminal law,' " *Williams*, 425 U.S. at 503, 96 S.Ct. at 1692 (quoting *Coffin v. United States*, 156 U.S. 432, 453, 15 S.Ct. 394, 402, 39 L.Ed. 481 (1895)). "To implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process * * * [and] must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Williams*, 425 U.S. at 503, 96 S.Ct. at 1692.

■ When a criminal defendant challenges a courtroom arrangement as eroding his presumption of innocence, "the first question is whether 'an unacceptable risk is presented of impermissible factors coming into play.' " *Coy v. Iowa*, 487 U.S. 1012, 1034, 108 S.Ct. 2798, 2809, 101 L.Ed.2d 857 (1988) (Blackmun, J., dissenting) (quoting *Williams*, 425 U.S. at 505, 96 S.Ct. at 1693). If so, then we classify the arrangement as "the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." [14] *Holbrook v. Flynn*, 475 U.S. 560, 568–69, 106 S.Ct. 1340, 1345–46, 89 L.Ed.2d 525 (1985). If the arrangement is not inherently prejudicial, then we employ a case-by-case approach to determine whether its use actually prejudiced the defendant. *Id.* at 569, 572, 106 S.Ct. at 1346, 1347.

■ Like the presence of uniformed and armed security personnel at trial that was at issue in *Holbrook*, the use of an anonymous jury "need not be interpreted [by jurors] as a sign that [the defendant] is particularly dangerous or culpable." 475 U.S. at 569, 106 S.Ct. at 1346. Rather, jurors are as likely to

---

**14.** In *Illinois v. Allen*, 397 U.S. 337, 343–44, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970), the Supreme Court, while expressly recognizing that "the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant," concluded that when "essential to the proper administration of criminal justice * * * binding and gagging might possibly be the fairest and most reasonable way" to deal with an

unruly defendant. The Court in *Estelle v. Williams*, noting that the *Allen* holding was justified by the state's "substantial need" to further an "essential state policy," held that a criminal defendant could not be compelled to attend trial in prison clothing because there existed no justification for the practice. 425 U.S. 501, 505, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976).

conclude their anonymity is designed to protect them from media or public pressures. Indeed, jurors who are unaware that anonymity is unusual are likely to draw no conclusions at all from the practice. We conclude that the use of an anonymous jury is not an inherently prejudicial practice. Consequently, our review of the use of anonymous juries shall be for actual prejudice to the defendant. *Id.* at 572, 106 S.Ct. at 1347.

■ Because we are "mindful that courts must indulge every reasonable presumption against the loss of constitutional rights," *Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970), we believe that where a burden is placed on the presumption of innocence, the trial court must do so in a way that strikes a reasonable balance with the defendant's right to the presumption. In light of the possibility that anonymity may lead jurors to infer that the accused is guilty of the crime charged and thereby burden his presumption of innocence, the question becomes: When and under what circumstances is it proper to use an anonymous jury?

The use of juror anonymity has been considered and approved by a number of federal appellate courts. It has typically arisen in cases involving Racketeer Influenced and Corrupt Organizations (RICO) prosecutions of organized crime figures. *See, e.g., United States v. Paccione,* 949 F.2d 1183 (2d Cir. 1991) (affirming trial court's decision to use an anonymous jury where its use was based, in part, on evidence that the defendant was a member of the Gambino Crime Family), *cert. denied,* —— U.S. ——, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992). In permitting anonymous juries, those courts have generally applied the following two-part rule: a trial court should not impanel an anonymous jury without (a) concluding there is strong reason to believe that the jury needs protection; and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant. *See, e.g., Paccione,* 949 F.2d at 1192; *United States v. Crockett,* 979 F.2d 1204, 1215 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1617, 123 L.Ed.2d 176 (1993).

The federal courts have found the first part of the rule satisfied under a number of circumstances. In *Paccione* the rule was satisfied where the defendant faced serious penalties if convicted, there was evidence that a codefendant had been murdered by certain defendants in the case, the defendant was a member of the Gambino crime family, government witnesses had received anonymous threats, and there was extensive pretrial publicity. 949 F.2d at 1192–93. In *Crockett* the rule was satisfied where one defendant headed and the other was a member of a violent criminal organization, there was evidence the defendants had attempted to influence or intimidate witnesses, and there was extensive pre-trial publicity. 979 F.2d at 1216. *See also United States v. Vario,* 943 F.2d 236, 240 (2d Cir.1991) (where the defendant was already charged with obstruction of justice, and there was extensive pre-trial publicity), *cert. denied,* 502 U.S. 1036, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992); *United States v. Thomas,* 757 F.2d 1359, 1362, 1364 (2d Cir.) (where the defendants were members of an organized criminal group and were charged with murdering government witnesses), *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985), and *cert. denied,* 479 U.S. 818, 107 S.Ct. 78, 93 L.Ed.2d 34 (1986); *United States v. Scarfo,* 850 F.2d 1015, 1023 (3d Cir.) (where the jury would hear testimony that, if believed, could cause them to become apprehensive for their safety or the safety of their families), *cert. denied,* 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988).

The second part of the rule has been satisfied where the trial court used extensive voir dire to expose juror bias, as in *United States v. Eufrasio,* 935 F.2d 553, 574 (3d Cir.), *cert. denied,* 502 U.S. 925, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991), where the trial court's instructions were designed to eliminate any implication as to the defendant's guilt, as in *Scarfo,* 850 F.2d at 1025–26, and where the trial court explained to the jurors that the purpose of anonymity was to shield them from media harassment and undesirable notoriety and publicity as in *Thomas,* 757 F.2d at 1364–65.

■ We hold that an anonymous jury may be impanelled where the trial court: (a) determines there is strong reason to believe

that the jury needs protection from external threats to its members' safety or impartiality; and (b) takes reasonable precautions to minimize any possible prejudicial effect the jurors' anonymity might have on the defendant. Those precautions must, at a minimum, include extensive voir dire to expose juror bias and instructions designed to eliminate any implication as to the defendant's guilt. Although the trial court need not make written findings as to the jury's need for protection, it must place in the record a clear and detailed explanation of the facts underlying its determination that there is strong reason to believe the jury needs protection from external threats to its members' safety or impartiality. If the court chooses to explain to the jurors why they are anonymous, the explanation should not unnecessarily burden the defendant's presumption of innocence. We believe that by following these rules, the use of an anonymous jury presents little risk of actual prejudice to a defendant.

■ Not every trial where there are threats to jurors' impartiality will require juror anonymity. The decision to impanel an anonymous jury must take place "in the light of reason, principle and common sense." *Thomas*, 757 F.2d at 1363. We will review the trial court's decision to impanel an anonymous jury for an abuse of discretion. *See, e.g., Crockett*, 979 F.2d at 1215.

■ The trial court's use of an anonymous jury in this case satisfies the rule we announce today. There were strong reasons to believe that the jury needed protection from external threats to its members' safety and impartiality. First, the state believed and ultimately presented credible testimony that Ed Harris had been murdered by members of the Vice Lords because they thought he may have been a government informant. *See Paccione*, 949 F.2d at 1192 (affirming use of anonymous jury due, in part, to the prosecution's belief that a codefendant's murder was connected to the case and to certain of the defendants). Second, once exposed to

evidence that the Haaf murder was retaliatory in nature, jurors could have reasonably concluded that were they to convict Bowles, they or their families would be vulnerable to harassment or retaliation from members of the Vice Lords. *See Scarfo*, 850 F.2d at 1023 (affirming use of anonymous jury due, in part, to presence of evidence that could cause jurors to fear for their safety and the safety of their families). Third, as Bowles himself notes, the publicity surrounding the murder and the trial put pressure on the jury to convict. The jurors could have reasonably concluded that were they to acquit Bowles, they or their families would be vulnerable to harassment from the public.[15] The jurors' anonymity may have actually protected them from this pressure, helping to preserve their impartiality. *See Vario*, 943 F.2d at 240 (affirming use of anonymous jury, in part, because of extensive pre-trial publicity).

The trial court also took adequate precautionary measures to ensure that juror anonymity did not infringe on Bowles' presumption of innocence. Prior to jury selection, the court informed the venire they would remain anonymous to shield them from media harassment. *See Thomas*, 757 F.2d at 1364–65. Both Bowles and the state were permitted to engage in an extensive voir dire of the prospective jurors regarding their ability to be impartial, their belief in the presumption of innocence, and the effect of their anonymity. *See Eufrasio*, 935 F.2d at 574. In addition, the trial court gave the jury a clear, strong instruction at the close of trial on Bowles' presumption of innocence and the state's burden to prove Bowles' guilt beyond a reasonable doubt.

As for Bowles' specific arguments regarding the anonymous jury, we find them unpersuasive. Bowles argues he was not a member of the Vice Lords or, at most, he was merely a foot soldier, and, therefore, could not have influenced the Vice Lords' activities. His actual membership, however, is relatively unimportant. What is important is the trial court had strong reason to conclude, and

---

**15.** We take judicial notice that jurors in the highly public and emotional trial of Robert Guevera, an accused who was acquitted of the sexual assault and murder of a 4–year–old child, experienced harassment from the media and the public after the acquittal, which occurred just two months before the commencement of voir dire in Bowles' trial.

evidence was going to be presented at trial from which jurors could reasonably conclude, that Bowles was a Vice Lords member and that other members had already murdered Ed Harris because of his potential as a witness in the prosecution of Bowles and others charged with the Haaf murder.[16]

Bowles argues an anonymous jury should only be used when the alternatives, *e.g.*, sequestration of the jury or withholding jurors' names from the media, are inadequate. We need not address that argument here because Bowles' proposed alternatives were inadequate. Sequestration would not have reduced the jurors' fears of harassment or retaliation after trial, and withholding jurors' names from the media would not have eliminated the risk of harassment or retaliation from Bowles and the Vice Lords.

Bowles argues that the Massachusetts Supreme Court's decision in *Commonwealth v. Angiulo*, 415 Mass. 502, 615 N.E.2d 155 (1993), supports his contention that his right to an impartial jury was violated. Bowles' reliance on *Angiulo* is misplaced. In that case, the court allowed the use of anonymous juries where "the trial judge has first determined on adequate evidence that anonymity is truly necessary and has made written findings on the question." *Id.* 615 N.E.2d at 171. Despite that holding, the *Angiulo* court overturned the appellants' conviction because the trial court, after the jurors discovered that they had been impanelled anonymously, failed to take any steps to minimize possible prejudice to the defendant. *Id.* The trial court here took appropriate steps to minimize possible prejudice.

We conclude that the use of the anonymous jury did not result in actual prejudice to Bowles. Indeed, he concedes there is no concrete evidence of prejudice. We hold that the trial court did not abuse its discretion when it impanelled the anonymous jury.

We turn next to Bowles' arguments regarding the sufficiency of the evidence. Bowles first argues that there is insufficient corroboration of the accomplice testimony of Richard to sustain his convictions. Minn.Stat. § 634.04 provides:

A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

Minn.Stat. § 634.04 (1994). Corroborating evidence is sufficient to convict if it reinforces the truth of the accomplice's testimony and points to the defendant's guilt in some substantial degree. *State v. Jones*, 347 N.W.2d 796, 800 (Minn.1984). Circumstantial evidence indicating the defendant's participation in the crime is sufficient to corroborate the accomplice's testimony. *Id.* We review circumstantial evidence corroborating an accomplice's testimony in the light most favorable to the verdict. *State v. Norris*, 428 N.W.2d 61, 66 (Minn.1988).

Our review of the record reveals that a number of important facts contained in Richard's testimony are corroborated by other witnesses and point to Bowles' guilt in some substantial degree. Richard testified Bowles hung around Vice Lords members. That testimony is corroborated by Bowles, who admitted he began the process of joining the Vice Lords; by McDaniel, who testified Bowles was a Vice Lords member; and by pictures admitted at trial showing Bowles posing with Vice Lords members as they flashed gang signs. Richard testified that he rented the tan, four-door Ford in which he drove to the Pizza Shack from a man named Billy in exchange for two pieces of crack cocaine. That testimony is corroborated by Benjamin Mitchell, who testified that on September 24 he lent a Ford Granada to a young

---

**16.** That is not to say that mere membership or association with a criminal organization, by itself, is enough to justify an anonymous jury. *United States v. Vario*, 943 F.2d 236, 241 (2d Cir.1991), *cert. denied*, 502 U.S. 1036, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992). Many criminal organizations will pose no threat to the jury system. However, where there is evidence that the organization may act on the defendant's behalf to influence the jury, or, as here, that the organization is willing to tamper with potential witnesses whether or not the defendant wishes it, then the defendant's tie to the organization militates toward juror anonymity.

black man. Richard identified that car as the one he used to drive McKenzie to the Pizza Shack. Richard testified that after settling on a plan to "do the Pizza Shack," A.C. Ford retrieved a paper bag containing a gun from the freezer on the porch of Sharif Willis' house and gave it to McKenzie. The location of the gun is corroborated by McDaniel, who testified that individuals at that house kept their weapons in a paper bag in the freezer on the porch.

Richard's testimony regarding the events after the shooting is also corroborated. Richard testified that when he arrived at the Harris home after the shooting, Bowles and McKenzie were there, wearing different clothes than those they had been wearing when they were dropped off to "do the Pizza Shack." That testimony is corroborated by Loverine Harris, who testified that early on the morning of September 25 Bowles and McKenzie entered her house and exchanged their shirts, shoes, and hats for clothing provided by her husband. She also testified that Richard arrived a short time later. Richard testified he was supposed to pick up Bowles and McKenzie after they "did" the Pizza Shack. That testimony is corroborated by Loverine Harris, who testified she overheard Richard telling Bowles and McKenzie that he was supposed to have picked them up in the "rental" car after they shot the police officer at the Pizza Shack. Richard testified that on the night of the shooting, Bowles and McKenzie told the Vice Lords member who lived across the street from the Harris home that they hid their guns at the Harris home. That testimony is corroborated by Loverine Harris, who testified that when Bowles and McKenzie asked her husband to hide their guns, he wrapped them in the shirts they had taken off, put them in a paper bag, and hid the bag in their attic. Loverine Harris also testified that the Vice Lords member who lived across from her home removed the guns the next day. Richard testified that while they were at the Harris home, McKen-

zie told him that he had shot a police officer. That testimony is corroborated by Loverine Harris, who testified that when Bowles and McKenzie arrived at her home they claimed to have shot a "crippled" man, and by McDaniel, who testified Bowles told him the evening after the murder that he and Montery Willis were leaving town because, "The thing with the cop last night, * * * we did that." Richard testified that later that morning he and Ed Harris went to Curley's where Harris purchased some food. That testimony is corroborated by Loverine Harris, who testified that Richard accompanied her husband to Curley's, where her husband was going to buy some curly fries and coffee. Finally, Richard's general version of the events that transpired that evening is corroborated by Melton, who testified that Bowles admitted he and McKenzie shot an officer at the Pizza Shack, and then ran to "Ed's" house, where they hid their guns and changed clothes.[17]

■ The testimony of Loverine Harris, McDaniel, Melton, and Mitchell, viewed in the light most favorable to the verdicts, corroborates and reinforces the truth of Richard's testimony, and points to Bowles' guilt. *Norris*, 428 N.W.2d at 66–67. We hold that Richard's testimony is sufficiently corroborated to sustain the convictions.

■ Bowles contends the benefits received by Loverine Harris, McDaniel, Richard, and Melton call their testimony into question. However, determinations as to witness credibility lie with the jury. *State v. Rainer*, 411 N.W.2d 490, 495 (Minn.1987). Here, at the time of trial, Bowles was aware that these four witnesses had been placed in witness protection programs or granted leniency in this or other criminal cases. Thus, he had every opportunity to expose their possible bias to the jury based on the receipt of those benefits.[18] The jury was free to credit or discredit their testimony.

---

17. Although, as Bowles argues, Melton had access through the media to some information concerning the crime, there is no evidence he could have learned other information from any source other than Bowles. This information includes the caliber of firearms used in the Haaf murder, and the circumstances of Bowles' arrest.

18. While we have no occasion to rule on the witnesses' credibility, we note that were Loverine Harris inclined to falsely implicate someone in the Haaf murder, her incentive would have been to implicate the individuals responsible for her husband's murder—someone other than Bowles since Bowles was in jail at the time. The fact is

Bowles next asserts the only evidence of his guilt is circumstantial and insufficient to support the convictions. When considering a sufficiency of the evidence claim, we review the evidence in the light most favorable to the verdict to determine if it was sufficient to permit the jury to conclude, beyond a reasonable doubt, that the defendant was guilty. *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989); *State v. Norris*, 428 N.W.2d 61, 66 (Minn.1988). Circumstantial evidence is sufficient to permit that conclusion if a detailed review of the evidence and the reasonable inferences from such evidence are consistent only with the defendant's guilt and inconsistent with any rational hypothesis except that of guilt. *Webb*, 440 N.W.2d at 430; *State v. Scharmer*, 501 N.W.2d 620, 622 (Minn.1993). From our detailed review of the entire record, we conclude that the inferences from that evidence, when viewed in the light most favorable to the verdicts, are consistent with Bowles' guilt and are inconsistent with any rational hypothesis except that of his guilt. *Norris*, 428 N.W.2d at 66; *Scharmer*, 501 N.W.2d at 622.

The third issue Bowles raises is that the trial court erroneously denied his motion for reconsideration of his motion for a new trial. He argues he was entitled to a new trial because he discovered after trial that: (1) Margaret Hapsch claimed she could now positively identify the gunman who shot Haaf, and it was not Bowles; (2) Wyvonia Williams, a defense witness at Bowles' trial, later recanted her testimony from Bowles' trial implicating McKenzie and testified that Minneapolis police officers intimidated and harassed her, and forced her to sign a false statement; and (3) the state provided Loverine Harris with $17,000 in relocation money and with character letters after the trial for a hearing at which she was trying to retain custody of her children.

A criminal defendant is entitled to a new trial on the basis of the recanted testimony of a material witness "only if the trial court is reasonably satisfied that the

testimony was false, that the party was taken by surprise by the testimony and was unable to meet it or did not know of its falsity until after the trial, and that the jury might have reached a different conclusion without the false testimony. * * * [I]f the trial court finds that the recantation is not genuine, then the court does not even need to proceed to the issue of whether the jury might have reached a different result without the witness' testimony." *State v. Erdman*, 422 N.W.2d 511, 512–13 (Minn.1988). The decision to grant a new trial based upon a claim of newly-discovered evidence rests with the discretion of the trial court. *Race v. State*, 504 N.W.2d 214, 217 (Minn.1993). To obtain a new trial on the basis of such evidence, the defendant must establish that: (1) the evidence was not known to him or his counsel at the time of trial; (2) the evidence could not have been discovered through the exercise of due diligence before trial; (3) the evidence is material, not merely impeaching, cumulative, or doubtful; and (4) the evidence will probably produce either an acquittal or a more favorable result for the defendant. *Id.*

The trial court concluded Hapsch's credibility was suspect because she was recanting testimony that had been consistent over three trials and a grand jury hearing, she was bitter with the Minneapolis police for failing to provide her with what she considered sufficient money and protection, and because she wanted to "disrupt the system." Because those findings are supported by the record, we conclude that this evidence was doubtful and that the trial court did not abuse its discretion in concluding that Hapsch's recantation was not genuine. *Erdman*, 422 N.W.2d at 513. In addition, we conclude Hapsch's recantation, if characterized as newly-discovered evidence, is not likely to produce either an acquittal or a more favorable result for Bowles, because all the remaining witnesses to the shooting witnessed at least two gunmen. *Race*, 504 N.W.2d at 217. The evidence regarding Williams and Harris, whether characterized as recanted or new, does not merit a new

she implicates Bowles and McKenzie and no one else. Further, Richard, Loverine Harris, McDaniel, and Melton all provided law enforcement authorities with their information prior to being

offered any benefit from the state. The information provided by each of them remained internally consistent through the trial and was corroborated by other testimony given at trial.

trial because it is merely impeaching and not likely to produce either an acquittal or a more favorable result for Bowles. *Erdman,* 422 N.W.2d at 512–13; *Race,* 504 N.W.2d at 217. The trial court's denial of Bowles' motion for reconsideration of his motion for a new trial was not error.

The final issue we address is one not directly raised by Bowles in his appeal. It is an issue, however, which causes us great concern and warrants our review. The jury retired for deliberations on June 30, 1993. On July 1 Juror #4 requested a private meeting with the trial judge. The trial court, after discussing the request with both trial counsel and obtaining their agreement, met with the entire jury without counsel present. The jurors, after less than a day of deliberations, indicated they had reached a stalemate. The ensuing discussion included the following exchange with the court:

Juror 4: Everyone's pretty frustrated and upset, you know. Now people are implying that, you know, it's a racial thing.

THE COURT: I can hear in your voice that you are very tense. I am well aware that this is a very intense experience that you're going through. I am not minimizing that. Feel free to be emotional about it. This is not something that I consider to be in any way negative. Feel free to talk. Tell me what you're saying. Go ahead.

Juror 4: Oh, I'll tell you later then.

THE COURT: Tell me now.

Juror 4: I mean—

THE COURT: You started saying that you thought that people were getting the sense that it was a racial thing.

Juror 4: No, it was implied that if the defendant was white I would have had a different verdict, you know, and I really don't appreciate that. I've been here every day. I've taken my notes. I've given my point of view. What else could I possibly do?

THE COURT: Obviously, I am not privy to your deliberations. Let me ask you as candidly as I can, given more time, do you think it's possible that you would arrive at a unanimous verdict? The foreperson is you, Number 24?

Juror 24: Yeah.

THE COURT: Do you think it's possible that, given additional time, you could reach, it's possible the jury could arrive at a unanimous verdict?

Juror 24: I do think we can for the point of, I think, right now we have frustration that's building and people are hesitant right now to just rehash the same old stuff again. They say they don't want to. I think we're stuck.

The jurors ultimately agreed to recess for the evening and decide the next morning whether to continue deliberating. They apparently continued deliberating as they returned guilty verdicts on July 4, 1993. When the jurors were polled, the record of that polling reveals the following:

THE COURT: Number 23, is this your true and correct verdict?

JUROR NO. 23: Yes, it is.

THE COURT: Number 4, is this your true and correct verdict?

*JUROR NO. 23:*[19] Yes, it is.

(Emphasis added).

 Bowles made a motion at the time of sentencing for a *Schwartz* hearing to examine the influence of juror misconduct on the verdicts. The trial court denied the motion, stating, "I think I should mention with respect to the *Schwartz* hearing that it's clear, at least to the Court, that based on my discussions with the jurors after the conclusion of the trial and the verdict being rendered, it was clear that they did deliberate at length, that it was an emotional experience, as I would have anticipated it would have been, but that there was no impropriety whatsoever."[20]

---

**19.** We cannot determine from the transcript whether this reference to Juror #23 is a transcription error or whether the response is Juror #4's "true and correct" verdict.

**20.** We note communications with the jury should always be in the presence of counsel and the defendant, and that a juror alleging misconduct by other jurors should be questioned outside of the presence of the other jurors. *State v. Kelley,* 517 N.W.2d 905, 908, 910 (Minn.1994).

**536**

Based on the record before us, we can only speculate that these discussions with the jurors took place off the record and without the knowledge or presence of either trial counsel. Thus, the record provides scant support for the trial court's conclusion "that there was no impropriety whatsoever." Further, the record leaves this court unable to determine whether race played an impermissible role in the jury's deliberations.[21]

As we stated earlier, criminal defendants have a constitutionally protected right to a fair trial by an impartial jury. U.S. Const. amend. VI; Minn. Const. art. I § 6; *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976); *State v. Hamm*, 423 N.W.2d 379, 385 (Minn. 1988). That right may be undermined by juror misconduct, and a new trial may be warranted. *See, e.g., State v. Kelley*, 517 N.W.2d 905, 910–11 (Minn.1994) (holding that certain juror misconduct, although not warranting a new trial by itself, provided a "secondary basis" for decision to grant a new trial); *State v. Cox*, 322 N.W.2d 555, 558 (Minn.1982) ("The exposure of a jury to potentially prejudicial material creates a problem of constitutional magnitude, because it deprives a defendant of the right to an impartial jury and the right to confront and cross-examine the source of the material.").

In this case, Bowles' race is relevant to the issue of his guilt only in that witnesses to the murder identified the gunmen as black. The fact that Bowles was of the same race as Juror # 4 is not relevant. Indeed, Juror # 4's race has no relevance to Bowles' guilt. The problem here is that the statements Juror # 4 complained of appear to have put race-based pressure on her to find Bowles guilty, rather than allowing her to determine Bowles' guilt or innocence based on the evidence presented at trial.

The general rule in Minnesota prohibits jurors from testifying upon an inquiry into a verdict's validity. Minn.R.Evid. 606(b). The rule, however, provides an exception for jurors' testimony regarding "whether extraneous prejudicial information was improperly brought to the jury's attention." *Id.* Where that has occurred, inquiry into the verdicts' validity may be appropriate. Race-based pressure constitutes "extraneous prejudicial information" about which a juror may testify.[22]

On the record here, it is impossible for us to determine what impact, if any, the extraneous prejudicial information had on the jury's verdicts. Specifically, we cannot determine whether Juror # 4 fully explained to the trial court the alleged statements made to her or her concerns about the statements.

21. We stated at footnote 1 that we found nothing to support Bowles' bald assertion that the proceedings were racist. That statement is not inconsistent with our conclusion that race may have played an impermissible role in the jury's deliberations. The fact that race may have played an impermissible role in jury deliberations does not render the entire "proceedings" racist. Indeed, that fact does not necessarily make the jury's deliberations racist. The term "racist proceedings" suggests a race-based structural defect which goes to the very nature and purpose of the proceeding and which results in behaviors which are inherently discriminatory. "Racist proceedings," in the context of a jury trial, are those where the issue of race so permeates the trial in a discriminatory manner that justice could not possibly be done. We do not find that situation here.

22. We do not find important the fact that the extraneous information in this case originated within the jury. As one commentator has argued regarding the analogous federal rule of evidence:

Supposedly democratic institutions like the jury can produce oppression when the majority

uses its values to demean the rights of others. If the jury supplants the judge as the source of oppression, the justification for the jury system is undermined and both the need and desirability of protecting jury decisions through competency law are diminished. Thus, where a verdict is animated by bias in the form of racial, ethnic, or other prejudice against a minority group, it may make sense from the standpoint of the policies underlying Rule 606(b) to permit jury testimony to expose that bias. As a matter of statutory interpretation, bias may be considered an outside influence if what is understood by that term is an influence "outside" of the record and the parameters of those values that the jury constitutionally may use in its deliberations.

27 Charles A. Wright and Victor J. Gold, *Federal Practice and Procedure*, Evidence § 6075 at 462 (1990). *See also State v. Callender*, 297 N.W.2d 744, 746 (Minn.1980) ("[Minn.R.Evid. 606(b)] should not be interpreted as completely foreclosing inquiry into jury deliberations even in cases in which there is strong evidence that racial prejudice infected the jury's verdict.")

We cannot determine what facts the trial court relied on in reaching its conclusion, "that there was no impropriety whatsoever." Nor can we determine whether the problems raised by the alleged statements were resolved in a manner that did not improperly influence the jury's and/or Juror # 4's deliberation and verdicts. Indeed, we cannot even determine whether Juror # 4, when asked "Is this your true and correct verdict?" was the one who answered the question.

We have concluded that an adequate review of the propriety of the jury's deliberations or of whether the verdicts rendered were Juror # 4's "true and correct" verdicts can only be accomplished by supplementation of the record now before us. Therefore, we retain our jurisdiction over those questions and remand the matter to the trial court for the limited purpose of supplementing the record. The trial court may, in its discretion, file a memorandum explaining in detail the basis for its conclusion "that there was no impropriety whatsoever," conduct a *Schwartz* hearing to investigate the possible juror misconduct, or conduct any further proceedings necessary to fully develop the record. The memorandum or other document developed on remand shall be filed in this court not later than 30 days from the date of this opinion.

Remanded for further proceedings with instructions; jurisdiction retained.