*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1039**

State of Minnesota,
Respondent,

vs.

Jermaine Edward Harris,
Appellant.

**Filed August 10, 2015
Affirmed
Stauber, Judge**

Hennepin County District Court
File No. 27-CR-13-33511

Lori Swanson, Minnesota Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Kelly O'Neill Moller, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Michael Kunkel, Assistant State Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Stauber, Presiding Judge; Connolly, Judge; and Bjorkman, Judge.

**U N P U B L I S H E D   O P I N I O N**

**STAUBER**, Judge

On appeal from his conviction of second-degree intentional murder, appellant

Jermaine Edward Harris argues that the district court erred by ruling that he could not

cross-examine the state's witness about conversations the witness had with his attorney, and erred by failing to instruct the jury on accomplice testimony. In his pro se supplemental brief, appellant also raises the jury-instruction issue and argues insufficiency of the evidence and attachment of jeopardy following the second trial. We affirm.

## FACTS

Appellant, D.D., J.H., and R.J. decided to smoke some PCP-laced cigarettes called "wet sticks," on the evening of November 21, 2012. Of the foursome, D.D. and R.J. were close friends, and appellant and J.H. were close friends. There had been a falling out between R.J. and appellant after R.J. slept with the mother of appellant's baby in July 2012. Upon learning this information, appellant had physically attacked R.J., and R.J. later retaliated the fight on another occasion, resulting in appellant getting shot in the leg. Thereafter, appellant stalked R.J. with the intention of shooting him or someone in his family, but by September 2012, appellant and R.J. had apparently resolved their conflict.

Earlier in the day on November 21, J.H., D.D., and appellant had been "riding around drinking, smoking, and hitting stings[1]" in D.D.'s gray Impala. When all four gathered at a friend's house in the evening, appellant was driving a white Ford Explorer. The four decided to "go get some sticks"; appellant was known to act "[k]ind of aggressive" when using this narcotic; D.D. was known to act "stupid" and "slow" when using this narcotic. They drove to a gas station in Minneapolis where they bought two or three PCP-laced cigarettes. Video surveillance recordings show that appellant was

---

[1] Selling drugs.

2

driving the Ford Explorer with J.H. as a passenger, and R.J. was driving the Impala with D.D. as a passenger.

According to J.H., they drove to a residential area near the gas station, the Impala parked behind the Ford Explorer, and everyone got into the Ford Explorer to smoke the PCP-laced cigarettes. R.J. and D.D. then left the Ford Explorer, appellant got out a few seconds later, and J.H., who was reclining intoxicated in his seat, heard five or six rapid gunshots. Appellant immediately got back into the Ford Explorer, and J.H. asked him what had happened, to which appellant replied, referring to R.J., "He shot me, I shot him." The next day, appellant and J.H. decided to blame R.J.'s murder on D.D.[2]

D.D.'s description of the events of the day mirrored J.H.'s, and his description of the murder and the parties' actions immediately preceding the murder were consistent with J.H.'s testimony. D.D. testified that he saw appellant holding a gun and firing it three or more times as he and R.J. stood outside of the Impala. According to D.D., J.H. did not leave the Ford Explorer, but he saw appellant get back into it and heard it drive away. After the shooting, D.D. could not rouse R.J. or find his car keys, which R.J. was holding when he was shot. When D.D. scrambled around looking for the keys on the ground, a neighbor threatened to shoot D.D., so he fled. D.D. tried to get help in a high-rise apartment, eventually took a bus from the area, and spoke to a transit officer who transported him to a hospital for evaluation because he was hysterical. Video recordings

---

[2] D.D. had been videotaped making inappropriate remarks about having sexual relations with R.J.'s girlfriend's nine-year-old daughter, which appellant and J.H. believed would provide a believable motive to support their claim that D.D. shot R.J.

from a bus and a high-rise apartment near the murder scene corroborated D.D.'s testimony about his whereabouts and actions following the murder.

Appellant was indicted on charges of first- and second-degree intentional murder. During his grand jury testimony, J.H. stated that "he was present at the time of the shooting," "was in the front passenger seat of a white Ford Explorer, and [appellant] was the driver." J.H. also stated that appellant "got out of the vehicle, [he] heard several gun shots, and [appellant] promptly got back in the vehicle and said words to the effect 'he shot me, so I shot him.'" Appellant's first jury trial began in June 2013.

After being granted immunity from prosecution except for perjury, J.H. gave testimony that conflicted with his grand jury testimony. "He said he felt pressured by the prosecution to implicate [appellant] before the grand jury. He was quite antagonistic to the State and clearly appeared upset at the prosecutors for their handling of the case. The Court allowed the State to treat [J.H.] as a hostile witness." When the jury could not reach a unanimous verdict, the district court declared a hung jury and ordered a mistrial.

In September 2013, appellant's second trial on the same charges began. Between the first trial and second trial, J.H. was charged with aiding an offender under Minn. Stat. § 609.495, subd. 3 (2012). J.H.'s more limited immunity during the second trial was referred to by the district court as "transactional immunity." J.H. refused to testify at appellant's second trial, claiming his Fifth Amendment right to remain silent, and he served a 90-day jail sentence for contempt of court.

When the jury could not reach a unanimous verdict in the second trial, appellant moved the district court to declare a hung jury and dismiss the charges; the state moved

4

to reschedule the trial a third time.  The district court dismissed the indictment "in the interests of justice" but "allow[ed] the State to re-file against [appellant] if it chooses to do so."  The district court found that appellant was estopped from arguing double jeopardy and that "the Court may order [appellant] to stand trial on this matter for a third time should the government seek to obtain a conviction."

The state immediately filed a complaint charging appellant with second-degree intentional murder and prohibited person in possession of a firearm.  The case proceeded to a third trial.  By then, J.H. had pleaded guilty to the aiding-an-offender charge but had not been sentenced.  Although J.H.'s plea to that charge was not made in conjunction with a plea bargain, appellant made a motion in limine to cross-examine J.H. about his conversations with his attorney relative to the plea and his potential sentence.  The district court excluded this evidence.  Appellant raised the issue again during trial, arguing that his constitutional confrontation rights should supersede J.H.'s right to claim attorney-client privilege for the plea discussions.  The district court ruled that J.H. could not be questioned about "plea offers and settlement offers."  During trial, J.H. was cross-examined at length about inconsistencies in his testimony at the other trials and his admitted inaccuracies during previous testimony and statements to police.  The district court also permitted J.H. to be cross-examined thoroughly about numerous meetings he had with the state that did not result in a plea bargain.  Appellant did not testify at his third trial.

After the jury convicted appellant of second-degree intentional murder following his third trial, appellant received a 450-month executed sentence on the second-degree murder conviction; the weapons charge was dismissed.

**D E C I S I O N**

*Confrontation Clause.* Appellant argues that the district court erred by denying him the right to cross-examine J.H. about conversations J.H. had with his attorney regarding the effect of his agreement to plead guilty to the aiding-an-offender charge.

> The evidentiary rulings of a district court lie within its sound judgment and will not be reversed absent an abuse of discretion. If an error was committed in admitting evidence, we determine whether there is a reasonable possibility that the evidence significantly affected the verdict. But if an evidentiary ruling involves constitutional error, we must look to the basis on which the jury rested the verdict and require a new trial unless the error is harmless beyond a reasonable doubt.

*State v. Lasnetski*, 696 N.W.2d 387, 392 (Minn. App. 2005) (citations omitted).

The Sixth Amendment guarantees a criminal defendant the right to confront witnesses against him. U.S. Const. amend. VI. This includes the right to cross-examine witnesses. *Davis v. Alaska*, 415 U.S. 308, 315-16, 94 S. Ct. 1105, 1110 (1974). The Supreme Court has "recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316-17, 94 S. Ct. at 1110. But the Confrontation Clause does not "prevent[] a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness," and a trial judge "retain[s] wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among

6

other things, . . . prejudice . . . or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435 (1986); *see State v. Lanz-Terry*, 535 N.W.2d 635, 640 (Minn. 1995) (stating that it is within "the discretionary authority of the judge to control the scope of cross-examination . . . limited by the Sixth Amendment").

The district court did not abuse its discretion by excluding the evidence of discussions between J.H. and his attorney surrounding J.H.'s guilty plea. Such communications are protected by the attorney-client privilege. *See* Minn. Stat. § 595.02, subd. 1(b) (2014). But appellant argues that, consistent with some federal law, Minnesota should recognize that the attorney-client privilege "must yield if necessary to ensure the level of cross-examination demanded by the Sixth Amendment. *Murdoch v. Castro,* 365 F.3d 699, 702 (9th Cir. 2004)." *Murdoch* recognizes that to date, in the federal cases that recognize that the primacy of the constitutional right over the privilege, no court has held that the underlying facts "warrant[ed] yielding the privilege to accommodate the Sixth Amendment." *Id*. at 703.

Even if we were inclined to recognize that the attorney-client privilege could be "trumped" by appellant's confrontation rights, the facts do not support doing so in this case. The district court gave defense counsel great leeway in the cross-examination of J.H. The jury was made fully aware of the timeline of J.H.'s ever-changing story about what happened on the night of R.J.'s murder, and of the inaccuracies of J.H.'s statements to police and court testimony. The district court also permitted defense counsel to cross-examine J.H. about each of at least three meetings he had with the prosecutor before

entering a guilty plea, suggesting that J.H. was motivated to testify against appellant in the third trial by the state's implied promises of sentencing leniency for his own conviction. Thus, the interest appellant would have gained in being able to obtain the privileged communications between J.H. and his attorney was of relatively low probative value because of the state's otherwise effective cross-examination. *See Lanz-Terry*, 535 N.W.2d at 642 (concluding that when the jury "possessed information sufficient to allow it to make a discriminating appraisal of" a witness's testimony, the district court did not abuse its discretion or permit a constitutional violation of the defendant's confrontation rights by excluding evidence that would have further demonstrated the witness's bias). Finally, even if the state was unable to fully discredit J.H. because of the district court's exclusion of this evidence, any error in that ruling was harmless. D.D. was also an eyewitness to the murder and testified that appellant shot R.J., and J.H.'s testimony on that point was cumulative.

*Accomplice Jury Instruction.* Appellant argues that the district court's failure to give an accomplice-liability instruction led to his being convicted of second-degree murder based on the uncorroborated testimony of his accomplices, J.H. and D.D. A conviction cannot be based on uncorroborated accomplice testimony. Minn. Stat. § 634.04 (2014) (stating that a defendant cannot be convicted on the "testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense"). An accomplice is generally a person who "could have been indicted and convicted for the crime with which the defendant is charged." *State v. Scruggs*, 822 N.W.2d 631, 640 (Minn. 2012) (quotations omitted).

8

"Corroborating evidence is sufficient to convict if it reinforces the truth of the accomplice's testimony and points to the defendant's guilt in some substantial degree." *State v. Bowles*, 530 N.W.2d 521, 532 (Minn. 1995). "An accomplice[-liability] instruction must be given in any criminal case in which any witness against the defendant might reasonably be considered an accomplice to the crime." *State v. Lee*, 683 N.W.2d 309, 315 (Minn. 2004) (quotation omitted).

Appellant did not ask for an accomplice instruction at trial. "[W]here a district court fails to give a required accomplice corroboration instruction and the defendant does not object, an appellate court must apply the plain error[3] analysis." *State v. Reed*, 737 N.W.2d 572, 584 n.4 (Minn. 2007). An appellate court reviews corroboration evidence of "an accomplice's testimony in the light most favorable to the verdict." *Bowles*, 530 N.W.2d at 532.

Appellant's claim does not satisfy the plain-error test. With regard to J.H., an accessory after the fact is not an accomplice. *State v. Henderson*, 620 N.W.2d 688, 701 (Minn. 2001). Under the facts presented, it may be reasonable to consider J.H. as an accomplice because he was appellant's good friend, rode in the Impala with him, and to a large degree acted in concert with him on the night of the murder. But even if the district

---

[3] "[B]efore an appellate court reviews an objected to error, there must be (1) error; (2) that is plain; and (3) the error must affect substantial rights. If these three prongs are met, the appellate court then assesses whether it should address the error to ensure fairness and the integrity of the judicial proceedings." *State v. Griller*, 583 N.W.2d 736, 740 Minn. (1998). Plain error requires reversal only if "the fairness, integrity, or public reputation of the judicial proceeding is seriously affected." *State v. Barrientos-Quintana*, 787 N.W.2d 603, 611 (Minn. 2010) (quotation omitted).

9

court erred by failing to give the instruction as to J.H., evidence is lacking that D.D. was appellant's accomplice. D.D. drove in R.J.'s vehicle and was a closer friend to R.J. than to appellant and J.H. When R.J. was shot, D.D. was standing next to him outside of the Impala, and the experience was so unnerving that he ran from the scene and was eventually taken to a hospital for psychiatric evaluation. These are not the actions of an accomplice.[4] Because D.D. was not an accomplice and his testimony alone would have convicted appellant, the district court's failure to give an accomplice instruction as to J.H. did not affect appellant's substantial rights. *See State v. Rossberg*, 851 N.W.2d 609, 618 (Minn. 2014) (applying only third prong of plain-error test to deny defendant's constitutional claim, stating that it was unnecessary to consider whether there was plain error when any violation did not affect defendant's substantial rights).

*Double Jeopardy*. Among his pro se arguments, appellant asserts that the district court's order dismissing the charges against him in the interests of justice and without prejudice was the functional equivalent of an acquittal, so that jeopardy attached, and he should not have been retried a third time. Appellate courts review double-jeopardy issues de novo. *State v. Leroy*, 604 N.W.2d 75, 77 (Minn. 1999). Appellant did not raise this issue in the district court, and appellate courts "do not ordinarily decide issues that are raised for the first time on appeal, even constitutional questions of criminal procedure." *State v. Anderson*, 733 N.W.2d 128, 134 (Minn. 2007) (quotation omitted); *see State v.*

---

[4] We reject appellant's pro se argument that D.D. was his accomplice because D.D., not appellant, shot R.J. A witness who is alleged to have committed the crime instead of the defendant is not included in the definition of an accomplice under section 634.04. *State v. Swanson*, 707 N.W.2d 645, 653 (Minn. 2006).

10

*Michaud*, 276 N.W.2d 73, 77 (Minn. 1979) (ruling double-jeopardy issue was waived when not raised to the district court). We will address the issue briefly, applying the plain-error test for unobjected-to trial errors. Minn. R. Crim. P. 31.02; *see Griller*, 583 N.W.2d at 740.

Once a defendant has been acquitted on the merits, he may not be retried on the same charges. Minn. Const. art. I, § 7. *See* U.S. Const. amend. V. "A [district] court's actions constitute an acquittal on the merits when the ruling of the judge, whatever its label, actually represents a resolution in defendant's favor, correct or not, of some or all of the factual elements of the offenses charged." *State v. Sahr*, 812 N.W.2d 83, 90 (Minn. 2012) (quoting *State v. Large*, 607 N.W.2d 774, 779 (Minn. 2000)). An appellate court considers "both the form and the substance of the [district] court's ruling" in determining whether a ruling constitutes an acquittal. *Sahr*, 812 N.W.2d at 90. In *Sahr*, the state conceded that it "lacked sufficient evidence to prove an essential element of the crime," the district court issued extensive findings that made clear that its "dismissal of the complaint constituted a decision in [the defendant's] favor," and that "it did not contemplate that [the defendant] would be subject to retrial." *Id*. Double jeopardy barred the defendant's retrial in *Sahr*. *Id*. at 93.

In contrast, the order of dismissal here includes a clear statement that the district court dismissed in the interests of justice under Minn. Stat. § 631.21 (2012), not as a decision in appellant's favor. The district court found that it would be "inappropriate" to require appellant, who had been jailed for approximately 11 months during the two trials, to stand trial a third time "on a first-degree murder charge determined by a grand jury

11

based upon prior testimony of [J.H.]—who has repudiated his earlier under-oath grand jury testimony." But the district court ultimately did not discount the possibility that the state could gain a first-degree conviction, finding that "the State may still be able to obtain an indictment for first-degree murder based upon the remaining evidence in the case" by refiling charges against appellant. *See State v. Hart*, 723 N.W.2d 254, 258 (Minn. 2006) (stating that upon dismissal of charges under Minn. Stat. § 631.21, the state may reinstate its case by recharging the accused).

The district court also specifically analyzed whether double jeopardy applied and concluded that it did not and that appellant was estopped from making this argument. *See State v. Soyke*, 585 N.W.2d 418, 420 (Minn. 1998) (noting that a hung jury is a typical reason showing manifest need for a mistrial, and that a mistrial for this reason does not trigger double-jeopardy protections and is entitled to great deference on appeal). On these facts, we conclude that the district court dismissed the indictment but did not intend the dismissal to constitute an acquittal on the merits, nor was the dismissal the functional equivalent of an acquittal on the merits.

*Sufficiency of Evidence*. In his pro se brief, appellant also argues that the evidence was insufficient to support his conviction.

> When evaluating whether the evidence is sufficient, [an appellate court] carefully examine[s] the record to determine whether the facts and the legitimate inferences drawn from them would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted. We view the evidence presented in the light most favorable to the verdict, and assume that the fact-finder disbelieved any evidence that conflicted with the verdict. The verdict will not be

12

overturned if the fact-finder, upon application of the presumption of innocence and the State's burden of proving an offense beyond a reasonable doubt, could reasonably have found the defendant guilty of the charged offense.

*State v. Fox*, ___ N.W.2d ___, ___, 2015 WL 1810482, at *12 (Minn. Apr. 22, 2015). Appellant argues that the jury could not have found that he intended to commit the murder and that there was reasonable doubt as to whether he committed it because J.H. and D.D. were unreliable witnesses and accomplices to the murder, and other evidence suggested an alternative perpetrator, did not show appellant's presence at the murder scene, or contradicted their testimony.

As to appellant's specific arguments, the jury could have found that appellant intended to commit the crime. While appellant argues that appellant's statement, "He shot me, I shot him" infers a lack of his intent to kill, it could also demonstrate his motive for killing. The closeness in proximity of the two clauses with the sentence and their parallel construction suggest a relational aspect between the two clauses. Further, the victim was shot six times, which alone would support an inference of intent. And while appellant now argues that his ingestion of PCP could have affected his mental state, he did not raise a defense based on his intoxication, and the jury implicitly rejected the notion that appellant's intent was diminished by his use of PCP. Moreover, any conflicts in the testimony, such as between a neighbor's testimony suggesting that D.D. might have been the shooter, and J.H.'s and D.D.'s testimony that appellant was the shooter, were entitled to be resolved by the jury. *See State v. Hamilton*, 289 N.W.2d 470, 477

13

(Minn. 1979) ("[T]he jury was entitled to believe complainant's story and disbelieve defendant's account."). The evidence was sufficient to support the jury's guilty verdict.

The jury could have reasonably found appellant guilty of second-degree murder. Two eyewitnesses testified to seeing appellant shoot the victim and provided a motive for him to do so. J.H.'s and D.D.'s character flaws and penchants for untruthful statements were fully explored by defense counsel, but the jury chose to believe their testimony, which was consistent. Other evidence, such as the gas station, bus, and high-rise apartment taped recordings partially corroborated their testimony. J.H. and D.D. were not accomplices, and doubts about the veracity or reliability of D.D.'s and J.H.'s testimony were to be resolved by the jury. *See State v. Pieschke*, 295 N.W.2d 580, 584 (Minn. 1980) ("[W]here resolution of the case depends on conflicting testimony, . . . weighing the credibility of witnesses is the exclusive function of the jury.").

**Affirmed.**